**David E. SKAGGS, et al., Appellants,**

v.

**Robin H. CARLE, Clerk of the United States House of Representatives, Appellee.**

No. 95–5323.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 6, 1996.

Decided April 22, 1997.

Louis R. Cohen argued the cause for appellants, with whom Lloyd N. Cutler, Jonathan J. Frankel, Bruce A. Ackerman and David A. Westbrook were on the briefs.

Kerry W. Kircher, Senior Assistant Counsel, U.S. House of Representatives, argued the cause for appellee, with whom Geraldine R. Gennet, Deputy General Counsel, was on the brief.

David G. Leitch, Amy F. Kett, Daniel J. Popeo and Paul D. Kamenar were on the brief for amici curiae Washington Legal Foundation, et al.

Before: EDWARDS, Chief Judge, WILLIAMS, and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Chief Judge EDWARDS.

GINSBURG, Circuit Judge:

The appellants, a group comprising 27 Members of the United States House of Representatives, six of their constituents, and the

League of Women Voters, appeal the judgment of the district court dismissing their challenge to two rules of the House of Representatives. The appellants claim that the rules violate the Constitution of the United States by infringing upon the rights of the individual Representatives to speak, to be heard, and to be counted. Because the injury that the appellants allege is hypothetical rather than actual, they lack standing to pursue this case. We therefore affirm the judgment of the district court.

## I. BACKGROUND

On January 4, 1995 the House of Representatives adopted House Rules XXI(5)(c) and XXI(5)(d). The former provides that: "No bill or joint resolution, amendment, or conference report carrying a Federal income tax rate increase shall be considered as passed or agreed to unless so determined by a vote of not less than three-fifths of the Members voting." The latter provides that: "It shall not be in order to consider any bill, joint resolution, amendment, or conference report carrying a retroactive Federal income tax rate increase."

The appellants brought suit challenging the constitutionality of each rule. *See Skaggs v. Carle*, 898 F.Supp. 1 (D.D.C.1995). They argued that the three-fifths majority required by Rule XXI(5)(c) is repugnant to the principle of majority rule they see embodied in the presentment clause of Article I, § 7 of the Constitution ("Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States"). As for Rule XXI(5)(d), they argued both that it unconstitutionally precludes the House from considering legislation upon which it is empowered by Article I, § 8 to act, and that it abridges the first amendment rights of the individual Members to speak and, on behalf of their constituents, to petition on the floor of the House.

Robin H. Carle, the Clerk of the House, moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court granted the motion, concluding that prudence counsels against deciding the merits of a partisan political dispute:

> Whether expressed in terms of a failure of standing, or "equitable" or "remedial" discretion, the fundamental consideration underlying those decisions is one of prudent self-restraint: federal courts should generally refrain, as a matter of policy, from intruding in the name of the Constitution upon the internal affairs of Congress at the behest of lawmakers who have failed to prevail in the political process.

*Id.* at 2. The court also dismissed the voters' derivative claims: To allow the voters to raise the claims of their Representatives, the court reasoned, "is an all-too-facile expedient to circumvent the doctrine of equitable discretion, and to subvert altogether the holdings of the line of discretionary abstention cases." *Id.* at 3. The plaintiffs appealed.

## II. ANALYSIS

The appellants call upon the court to consider the constitutionality of two rules governing the internal workings of a coordinate branch of the Government. The appellants maintain that we are both authorized and competent to perform this task: The harm worked by the Rules—diluting the Representatives' votes and diminishing their ability to advocate a position—is apparent, as is the command of the Constitution that we remedy that harm. The Clerk responds, among other things, that the appellants lack standing because they have suffered no concrete injury.

### A. Rule XXI(5)(c)

According to the appellants, the presentment clause establishes that a simple majority of the Members voting in each House of the Congress is all that is needed to pass a bill. Therefore, we are told, by providing that legislation carrying an income tax increase will not be considered to have passed in the House even if it receives the support of a majority (but not of a three-fifths majority), Rule XXI(5)(c) runs afoul of the presentment clause.

The Clerk contends that the appellants lack standing to raise this challenge because they have suffered no injury by reason of

Rule XXI(5)(c) and are unlikely ever to do so. The House has never failed to deem passed a bill that has received the support of a simple majority and it is unclear whether the House will ever do so.

■ In order to establish their standing to sue under Article III of the Constitution, the appellants must show that: (1) they have suffered an injury that is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'"; (2) that the injury is fairly traceable to the conduct of which they complain; and (3) the injury is likely to be redressed by a court decision in their favor. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). The appellants bear the burden of establishing each element. *Id.* at 560–61, 112 S.Ct. at 2136–37. A Representative, like any other plaintiff, must satisfy each requirement—injury in fact, causation, and redressability—announced in *Lujan. See Boehner v. Anderson,* 30 F.3d 156, 159 (D.C.Cir.1994).

■ The appellants claim that Rule XXI(5)(c) injures them in fact because it dilutes the vote of each Representative in the same manner as did the rule challenged in *Michel v. Anderson,* 14 F.3d 623 (D.C.Cir. 1994). In that case a group of Representatives and voters challenged the House Rule giving each territorial delegate a vote in the Committee of the Whole. The Representatives claimed that they were each entitled to cast one of no more than 435 votes in the Committee and that the rule injured them by diluting each of their votes to one of 440. The voters raised the derivative claim that they had been deprived of a Representative entitled to cast one of only 435 votes. We held that, even if the doctrine of equitable discretion blocked the Representatives' challenge, the voters had standing to complain about the dilution of their representation; they had alleged a concrete injury.

The present appellants argue that, just as the voters in *Michel* had standing to challenge the dilution of a Member's vote to one of 440 that could be cast in the Committee of the Whole, so too do they have standing to challenge the dilution of a Representative's vote from one of 218 to one of 261 needed (assuming that all 435 Members vote) for the House to pass an income tax increase. The injury is neither conjectural nor hypothetical, they say, because the House has already taken several votes that were subject to Rule XXI(5)(c). According to the appellants, it is immaterial that Rule XXI(5)(c) did not affect the outcome of any such vote, i.e., there was not even a simple majority in favor of an income tax increase; it is enough under *Michel,* they argue, that the vote of each Member is in some way diluted. In addition the appellants assert (without elaboration) that Rule XXI(5)(c) reduces each lawmaker's power to bargain with his or her colleagues in order to pass an income tax increase—presumably because each Member can now offer only 1/261st of the votes needed.

The Clerk responds that the plaintiffs in *Michel* would have suffered a concrete injury, namely the dilution of their Representatives' votes, as soon as a vote was taken in the Committee of the Whole, and it was certain that such a vote would be taken. Therefore, the injury alleged in *Michel* was imminent, if not actual. In the present case, by contrast, the Clerk contends that the appellants would be injured only if a particular piece of income tax legislation for which the Member-appellants voted were to garner a simple majority but fail to pass under Rule XXI(5)(c) for want of a three-fifths majority. That these conditions will be met is far from certain; indeed, we are told, both reason and experience suggest that it is unlikely, making the appellants' injury neither imminent nor a concrete probability but only a hypothetical and speculative possibility.

■ As an initial matter, we do not agree with the Clerk that, in order to establish that they have been injured by the Rule, the appellants would have to show that 218 Members have voted or would vote (but for the Rule) in favor of a bill carrying an income tax increase. The lesson of *Michel* is that vote dilution is itself a cognizable injury regardless whether it has yet affected a legislative outcome.

We do agree, however, that the appellants' alleged injury depends upon their assertion that Rule XXI(5)(c) in fact renders the votes

of 218 Members inadequate to pass legislation carrying an income tax increase. If the votes of 218 Members are still sufficient in practice to pass such legislation, then Rule XXI(5)(c) has not caused the vote dilution that would establish their injury for the purpose of standing under Article III.

Both the House Rules and their role in the 104th Congress strongly suggest that Rule XXI(5)(c) does not prevent 218 Members set upon passing an income tax increase from working their legislative will. First, the House Rules allow any Member to introduce a resolution to amend or to repeal Rule XXI(5)(c), and any such resolution could be adopted by the vote of a simple majority. *See* House Rule X(1)(m) and XI(4)(d); *see also, for example,* H. Res. 168, 104th Cong., 1st Sess., 141 Cong. Rec. 6104, 6116 (1995) (amending Rule XIII(4)). Although the Rules Committee would have jurisdiction over such a resolution and might slow or block its consideration, 218 Members of the House could by petition cause a resolution to be discharged from that Committee and put to a vote on the floor of the House. *See generally Deschler's Precedents of the United States House of Representatives,* vol. V, at 3 (motion to discharge); *id.,* vol. I, at 318–319 (procedure for discharging from Rules Committee resolution to amend the rules). Similarly, if the Rules Committee determines that the vote on a bill should be governed by a special rule, a simple majority may amend that rule. *See id.,* vol. VI, at 328–329. For that matter, a simple majority may suspend Rule XXI(c)(5) in order to allow a bill carrying a tax increase to pass by a simple majority vote; although suspending a rule ordinarily requires the support of two-thirds of those voting, *see* House Rule XXVII, a simple majority has in the past resolved to suspend this two-thirds requirement. VIII *Cannon's Precedents of the House of Representatives* at 841. And, contrary to the dissent, these procedures for amending, suspending, and repealing the House Rules are not "alternative remedies" for the vote dilution allegedly worked by Rule XXI(5)(c). Rather, if a simple majority can prevail in the House by voting first on a procedural and then on the substantive issue, then there has been no

vote dilution even arguably offensive to the presentment clause.

The appellants object that the procedures by which they might avoid the three-fifths requirement of Rule XXI(5)(c) are rarely tried and still more rarely successful. For example, they observe that "[s]pecial rules are now so complex and detailed that it is extremely difficult for the floor to amend them without the assistance of the Rules Committee."

The Clerk's very telling response is that on at least four occasions during the 104th Congress the House voted to waive the requirements of Rule XXI(5)(c) in order to allow a simple majority to enact legislation that increased income tax rates. *See* H. Res. 238, 104th Cong., 1st Sess., 141 Cong. Rec. 10314, 10327–28 (1995) (suspending application of Rules XXI(5)(c) and (d) in connection with Medicare Preservation Act); H. Res. 245, 104th Cong., 1st Sess., 141 Cong. Rec. 10853, 10867–68 (1995) (same in connection with Seven Year Balanced Budget Reconciliation Act); H. Res. 392, 104th Cong., 2d Sess., 142 Cong. Rec. 3029, 3045 (1996) (same in connection with Health Coverage Availability and Affordability Act); H. Res. 440, 104th Cong., 2d Sess., 142 Cong. Rec. 5432, 5444–45 (1996) (same in connection with Small Business Job Protection Act). However complicated the procedures for suspending Rule XXI(5)(c) may seem, therefore, they do not appear in practice to prevent a simple majority from enacting an income tax increase.

Chief Judge Edwards, in dissent, concludes that the present appellants' votes were diluted as in *Michel* when they voted in favor of the Mink Amendment. But our colleague is able to reach this conclusion only because he assumes that in fact "each of the 96 votes in favor of the Amendment represented only 1/261st of those necessary for passage." As we see it, the plaintiffs have given little reason to believe that the Mink Amendment would not have passed had it had the support of 218 Members. For, as detailed above, when a simple majority wanted to vote for legislation increasing income tax rates, the House has voted to waive the Rule; indeed, the appellants point to no instance in which a Member (presumably one

who wanted to vote for legislation increasing income tax rates) proposed to waive the Rule but the House voted against waiving the rule. We are therefore forced to the conclusion that the plaintiffs have alleged only a conjectural or hypothetical injury.

In sum, the appellants claim that they face imminent injury because a simple majority of the House of Representatives cannot commit the House to raising income tax rates. We are unpersuaded, however, that Rule XXI(5)(c) prevents a simple majority from doing just that. At most the appellants have shown that Rule XXI(5)(c) could, under conceivable circumstances, help to keep a majority from having its way—perhaps, for example, because a simple majority in favor of an income tax increase might not be prepared, for its own political reasons, to override the preference of the House leadership against suspending or waiving the Rule in a particular instance. But that prospect appears to be, if not purely hypothetical, neither actual nor imminent. We conclude therefore that the appellants lack standing to challenge Rule XXI(5)(c).

B.   Rule XXI(5)(d)

In what seems to be an afterthought—for they give the matter almost no separate attention—the appellants challenge Rule XXI(5)(d) on the grounds that it (1) "deprives the Member Appellants of some of the 'legislative Powers' that the Constitution vested in House Members" in violation of Article I, § 8 of the Constitution and (2)[a] "bar[s] Members from proposing and discussing matters within Congress's competence and [b] prevent[s] their constituents from effectively petitioning the Congress and from having their Representatives present their views" in violation of the first amendment. With respect specifically to injury, the appellants allege that Rule XXI(5)(d) prevents each Member-appellant from "introducing or debating on the House floor legislation that might increase tax rates retroactively." And, we are told—in the only purely factual allegation relevant to injury—that "Rule XXI(5)(d) continuously stifles debate on the House floor."

The Clerk responds that no Member has ever tried to introduce a bill carrying a retroactive tax increase, nor even risen to speak in favor of such an increase only to be ruled out of order by reason of Rule XXI(5)(d). Therefore, according to the Clerk, no Member, let alone one of the appellants, has suffered the concrete injury necessary for standing to challenge the Rule.

■ Although the appellants claim that the Rule stifles debate on the floor of the House, they do not explain how the Rule does this. After reading the Rule more than once, we remain at a loss to know how it affects the appellants. The Rule, recall, provides that "[i]t shall not be in order to consider any bill [etc.] carrying a retroactive Federal income tax rate increase." We cannot ascertain from this text, standing alone, whether the Rule forbids a Member from proposing a retroactive income tax increase; forbids the leadership from allowing Members to debate a retroactive income tax increase; precludes the House voting on a retroactive income tax increase; has all of these effects, or none of them. Or more: Does it forbid a Member from speaking in favor of repealing the Rule? We are reluctant to think that it does, but the Rule leaves even this question unanswered. Still, the appellants offer nothing but the Rule in support of their standing—no legislative history, no facts to which it has been applied, nothing.

Without further factual allegations the court can neither know what the Rule means in practice nor see how the appellants have been injured by it. See U.S. Const., Art. I, § 5 ("Each House may determine the Rules of its Proceedings ..."); United States v. Rostenkowski, 59 F.3d 1291, 1306–07 (D.C.Cir.1995) ("Where ... a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone."). Thus the appellants have not made out their standing to complain of the Rule.

■ We reach this conclusion fully aware—albeit no thanks to the appellants—that a party has standing to challenge a law

before it is enforced against him provided that his first amendment rights are chilled by a credible threat of prosecution under that law. *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 642–43, 98 L.Ed.2d 782 (1988); *Chamber of Commerce v. FEC,* 69 F.3d 600, 604 (D.C.Cir. 1995). Putting aside the question whether the House of Representatives is constrained by the first amendment in determining the Rules of its Proceedings—a question not raised by the Clerk—we are not persuaded that Rule XXI(5)(d) even arguably chills the first amendment rights of the Member-appellants. First, there is no apparent penalty for attempting to do whatever it is the Rule proscribes; so far as we can tell, one may at most be ruled "out of order." Moreover, those whose first amendment rights are allegedly chilled by the Rule are all Members of the United States House of Representatives. We cannot imagine that the mere risk of being ruled out of order has caused the Member-appellants—or any Member of the House—to cower silently in derogation of his or her perceived constitutional right, indeed duty, to speak on behalf of himself and his constituents.

Before repairing to the courts, therefore, we think it only appropriate for those who would object to the Rule first to test its meaning by pursuing in the House a retroactive Federal income tax rate increase. If they are ruled out of order merely for speaking their minds, or for any other act even arguably protected by the first amendment, then they can document their injury and assert their standing to sue.

## III. CONCLUSION

Because the appellants do not allege that they have suffered any concrete injury as a result of either Rule XXI(5)(c) or Rule XXI(5)(d), they have not established their standing to sue. The judgment of the district court is therefore

*Affirmed.*

HARRY T. EDWARDS, Chief Judge, dissenting:

Appellants ask this court to decide whether Congress, through a purported House Rule of Procedure, can change the number of votes required to enact a bill into law. At issue here is House Rule XXI(5)(c) ("Rule"), which provides that

> [n]o bill or joint resolution, amendment, or conference report carrying a Federal income tax rate increase shall be considered as passed or agreed to unless so determined by a vote of not less than three-fifths of the Members voting.

Under this Rule, Members of the House of Representatives who voted in favor of tax legislation have suffered a dilution of their votes from 1/218th to 1/261st of the votes necessary to pass a tax increase. As a consequence, these Members, a number of whom are appellants in this case along with the voters they represent and the League of Women Voters ("LOWV"), have suffered the requisite injury to satisfy the Article III standing requirements. I, therefore, dissent from the judgment of the majority dismissing this case for lack of standing. I also find that House Rule XXI(5)(c) cannot withstand constitutional scrutiny.

The presentment clause of the Constitution requires that

> [e]very Bill which shall have *passed* the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States.

U.S. CONST. art. I, § 7, cl. 2 (emphasis added). To determine the meaning of "passed" under the presentment clause, I look to the intent of the Framers of the Constitution, as well as Supreme Court precedent construing the clause. This evidence—along with long-standing traditions underlying our constitutional democracy—makes it clear that "passed" means "passed by a majority," except in those few instances where the Constitution explicitly states otherwise. The rule-making clause of the Constitution, which merely provides that each House has the power to "determine the Rules of its Proceedings," U.S. CONST. art. I, § 5, cl. 2, surely is not an explicit exception to the presentment clause. Thus, in using the rulemaking clause to redefine what it means for a bill to be passed, Rule XXI(5)(c) rewrites the im-

perative of the presentment clause and, therefore, must be struck down.

If Congress is allowed to employ the rulemaking clause to impose new supermajority requirements beyond those already stated in the Constitution, the potential for mischief is great. Two simple examples will suffice to highlight the problem:

*Example One:* [1] The Clerk's argument in favor of House Rule XXI(5)(c) would allow the House to adopt an internal rule of procedure that requires the votes of nine-tenths of its Members to pass a bill into law, thus giving one state, California, which elects over ten percent of the Members of the House, effective veto power over proposed legislation.

*Example Two:* [2] Because the rulemaking clause applies equally to both Houses of Congress, the Clerk's argument in favor of House Rule XXI(5)(c) would allow the Senate to adopt an internal rule of procedure that requires the votes of three-fifths, rather than one-half, of its Members to confirm a presidential appointee. The Senate, acting unilaterally, could thereby increase its own power at the expense of the President.

I think it is clear that the Framers never intended for Congress to have such unchecked authority to impose supermajority voting requirements that fundamentally change the nature of our democratic processes. It is for this reason that I find House Rule XXI(5)(c) to be an unconstitutional exercise of Congress's rulemaking power.[3]

## A. *The Jurisdiction of This Court*

Before turning to the merits, I will first address the jurisdictional issues on which my colleagues decide this case. I disagree with the majority, because I find that appellants have fully satisfied traditional standing requirements and that the doctrine of equitable

or remedial discretion does not act as a bar to judicial review of their claims.

### 1. Standing

It is well established that in order to satisfy the constitutional standing requirements of Article III, plaintiffs must demonstrate (1) that they have suffered injury that is concrete and particularized, not conjectural or hypothetical; (2) that the injury is fairly traceable to the conduct of which they complain; and (3) that the injury is likely to be redressed by a court decision in their favor. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). Under the precedent of this circuit, these requirements are satisfied by the dilution of appellants' votes in favor of the Mink Amendment.

*Michel v. Anderson*, 14 F.3d 623 (D.C.Cir. 1994), described in detail by the majority, clearly governs the result in this case. In *Michel*, this circuit found that congressional vote dilution constitutes cognizable injury for both the Members of Congress whose votes are affected and for the voters who rely on such Members to represent their interests. *Id.* at 625–26; *see also Vander Jagt v. O'Neill*, 699 F.2d 1166, 1170 (D.C.Cir.1983) (In a case challenging the allocation of House committee and subcommittee seats, this court found that Republican Members had standing to sue based on the alleged dilution of their votes by virtue of the disproportionate allocation of the seats.). The plaintiff Members in *Michel* suffered cognizable injury based on vote dilution where the value of each Member's vote in the Committee of the Whole was diluted from 1/435th to 1/440th by a House Rule that gave the vote to the five territorial delegates. The court found standing despite the fact that after any vote in which the territorial delegates' votes were outcome determinative, a new vote would be taken without including them.[4]

---

1. *See* Jed Rubenfeld, *Rights of Passage: Majority Rule in Congress*, 46 Duke L.J. 73, 83–84 (1996).

2. *See* Susan Low Bloch, *Congressional Self-Discipline: The Constitutionality of Supermajority Rules*, 14 Const. Comm. 1, 4–5 (1997).

3. Appellants also challenge House Rule XXI(5)(d), which states that "It shall not be in

order to consider any bill ... carrying a retroactive Federal income tax rate increase." I can find no merit in this claim, so I do not address it.

4. *See* 14 F.3d at 625 (citing the House Rule at issue in the case, which provides "[i]n a Committee of the Whole House on the state of the Union, the Resident Commissioner to the United States from Puerto Rico and each Delegate to the

Like the majority, I, too, find that *Michel* stands for the proposition that "vote dilution is itself a cognizable injury regardless whether it has yet affected a legislative outcome." Appellants here suffered vote dilution when they voted in favor of the Mink Amendment, which proposed an increase in corporate income tax rates.[5] The vote-counting rule applicable to the Mink Amendment was Rule XXI(5)(c). The Mink Amendment was defeated by a vote of 96 to 336. Under Rule XXI(5)(c), each of the 96 votes in favor of the Amendment represented only 1/261st of those necessary for passage, rather than the 1/218th that they would have represented under the normal practice of "majority rule." This vote dilution constitutes injury-in-fact sufficient to meet the Article III standing requirements.

The majority claims Rule XXI(5)(c) caused no cognizable vote dilution because 218 Members set upon passing an income tax increase could have attempted to avoid the effect of the Rule. According to the majority, the Members in favor of a tax increase can first seek to pass a resolution to amend or to repeal Rule XXI(5)(c) and then they can pursue passage of an income tax increase pursuant to a simple majority vote. The same could have been said to deny standing in *Michel* and *Vander Jagt*—i.e., the aggrieved Members in those cases could have been told to muster a majority of their colleagues to change the disputed rule—but the court eschewed any such view of standing. Even more noteworthy is the fact that, in *Michel*, the court found an injury even though the vote dilution at issue could *never* affect whether a bill became law. Thus, *Michel* makes clear that the substantive outcome is irrelevant—it is the vote dilution *itself* that causes the injury.

In an apparent effort to avoid what is obvious from *Michel* and *Vander Jagt*, the majority opinion uses a strand of the remedial discretion doctrine to change the requirements of Article III standing. The majority says that if a plaintiff can find an alternative remedy for the injury that is the subject of the law suit, then there can be no judicially cognizable injury to support Article III standing. This is an extraordinary holding that finds no support in the law on standing. Indeed, the only case law offering any support for this notion is the questionable remedial discretion doctrine of this circuit.[6] *See, e.g., Riegle v. Federal Open Market Comm.*, 656 F.2d 873, 881 (D.C.Cir.1981) (holding that dismissal of a legislator's suit under a doctrine of remedial discretion is appropriate "[w]here a congressional plaintiff could obtain substantial relief from his fellow legislators"). However, the remedial discretion doctrine never has been part of the standing inquiry, and the majority cites to no case that suggests otherwise. The question, thus, is not whether appellants could have prevented the vote dilution injury by repealing or amending House Rule XXI(5)(c). The question is whether appellants in fact have suffered vote dilution.

Having established that the vote dilution caused by Rule XXI(5)(c) satisfies the injury-in-fact prong of the standing inquiry, appellants' challenge to Rule XXI(5)(c) also satisfies the next two prongs of the standing inquiry, causation and redressability. The Rule published by the Clerk causes the harm. And the harm could be redressed by

House shall possess the same powers and privileges as Members of the House" but "[w]henever a recorded vote on any question has been decided by a margin within which the votes cast by the Delegates and the Resident Commissioner have been decisive, the Committee of the Whole shall automatically rise and the Speaker shall put that question de novo without intervening debate or other business. Upon the announcement of the vote on that question, the Committee of the Whole shall resume its sitting without intervening motion.").

5. *See* Declaration of Barbara K. Bracher, Principal Assistant General Counsel and Solicitor to the United States House of Representatives (July

14, 1995) (describing the application of Rule XXI(5)(c) to the Mink Amendment to H.R. 4), *reprinted in* Joint Appendix ("J.A.") 136–37.

It is clear from the record that the Mink Amendment was supported by at least some of the appellant Members. *See, e.g.,* Declaration of the Honorable Patsy T. Mink (June 15, 1995), *reprinted in* J.A. 84; Declaration of the Honorable Bruce E. Vento (June 16, 1995), *reprinted in* J.A. 127.

6. As indicated in part A.2. *infra*, even assuming its continued validity, the remedial discretion doctrine is not dispositive of this case.

a declaration from this court that the Rule violates the Constitution.

Like the Members, the individual voters and the LOWV also meet the standing requirements. In *Michel*, this court, acting in reliance upon Supreme Court precedent that recognizes that voters have standing to challenge practices that dilute their vote, found that voters suffer cognizable injury through the dilution of the voting power of their representatives. *See* 14 F.3d at 626 (holding that it was of no significance that the voters' vote dilution claim could be considered derivative of their representatives' claim). Just such dilution occurred here where, by operation of Rule XXI(5)(c), a voter represented by a congressional Member who favored the Mink Amendment no longer had as much access to political power as a voter represented by a Member who opposed the Amendment.[7] And, of course, the voters satisfy the causation and redressability prongs of the analysis for the same reasons as the Members.

The LOWV has representational standing pursuant to *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Under *Hunt*, an organization such as LOWV has standing if (1) its members would have standing to sue on their own; (2) the interests it seeks to protect are germane to its purpose, and (3) its claim and requested relief do not require participation by individual members. *Id.* The *Hunt* test is satisfied in this case. For one thing, the League's members are no different than the individual voters, so they have standing to sue on the same terms. Furthermore, the interests the League seeks to protect are germane to its purpose. *See* Declaration of Becky Cain, President of the League of Women Voters of the United States (June 13, 1995), *reprinted in* J.A. 52, 53 ("The League is a non-partisan membership organization consisting of voters committed to the improvement and reform of representative democracy."). Finally, the League's claim and requested relief do not require participation by individual members.

Therefore, all of the appellants—the Members, the individual voters, and the LOWV—meet the standing requirements under Article III of the Constitution.

## 2. Remedial Discretion

The District Court did not doubt the standing of appellants. Rather, the trial court dismissed all of appellants' claims—the Members, the individual voters, and the LOWV—on the basis of its perceived remedial discretion. *See Skaggs v. Carle*, 898 F.Supp. 1, 2 (D.D.C.1995) ("The [defendant's] motion [to dismiss] will be granted on the sole ground of the doctrine of equitable or remedial discretion."). This doctrine has been described as a "prudential self-imposed limitation" on the court's jurisdiction. *Michel*, 14 F.3d at 628. It permits the court to decline to hear a case even when it has Article III jurisdiction over the controversy. The remedial discretion doctrine has never been adopted by the Supreme Court; and, as I have previously indicated, the constitutional status of the doctrine is questionable. *See Melcher v. Federal Open Market Comm.*, 836 F.2d 561, 565 (D.C.Cir.1987) (Edwards, J., concurring). However, the doctrine remains the law of the circuit, by which I am bound.

The important point here is that, whether or not remedial discretion is a viable doctrine, it has no application in this case. Even assuming, *arguendo*, that the claims of the congressional Members should be dismissed, the *Michel* decision makes it clear that remedial discretion cannot be used against the non-congressional plaintiffs who possess standing. *See Michel*, 14 F.3d at 627–28 (Regardless of whether the remedial discretion doctrine bars the challenge of Members of Congress to the constitutionality of a voting rule change, the doctrine cannot be employed to bar a private citizen's claim over which the court has jurisdiction.). In short, the doctrine never has been held to be applicable to claims other than those brought by legislators. *See* 14 F.3d at 628. ("[Remedial discretion] has no applicability to private vot-

---

**7.** It is clear from the record that the Mink Amendment was supported by at least some of the appellant voters' representatives. *See, e.g.*, Declaration of June Austin (June 14, 1995) (rep-

resented by Congressman Maurice D. Hinchey, who voted in favor of the Amendment, *see* 141 Cong. Rec. H3777 (daily ed. Mar. 24, 1995)), *reprinted in* J.A. 61.

ers."); *see also Gregg v. Barrett*, 771 F.2d 539, 546 (D.C.Cir.1985). Thus, it is plain here that this court must exercise its jurisdiction over the claims brought by the individual voters and the LOWV. Accordingly, because their claims are the same, it is unnecessary to decide whether the remedial discretion doctrine would mandate dismissal of the Members' case. I, thus, turn to the merits of appellants' challenge to Rule XXI(5)(c).

## B. *The Constitutionality of Rule XXI(5)(c)*

The presentment clause of the Constitution says that "[e]very Bill which shall have *passed* the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States." U.S. CONST. art. I, § 7, cl. 2 (emphasis added). Although the word "passed" is not defined explicitly, an analysis of the Framers' intent and Supreme Court precedent demonstrate that it means passed by a majority. The majority-passage rule is not a malleable default position. It is an unalterable constitutional demand. I, therefore, find that Rule XXI(5)(c) is an unconstitutional exercise of Congress's rulemaking power.

### 1. The Intent of the Framers

In this case, unlike many law suits involving constitutional claims, the intent of the Framers is both evident and enlightening with respect to the issue at hand. The Framers had experienced supermajority voting requirements under the Articles of Confederation, and they specifically debated and rejected similar proposals when the Constitution was drafted and ratified. Historical evidence shows that, during their deliberations, the Framers positively concluded that a simple "majority vote" was sufficient for the passage of legislation in Congress. And nothing has changed since the Framers' deliberations—either in the words of the Constitution or in societal conditions—warranting an alteration of their original intent. Thus, this case is unique in that there is actually something to be gained by starting the analysis of appellants' claim on the merits with an assessment of the Framers' intent.

### a. The Constitutional Convention

The general rule governing parliamentary procedure at the time of the constitutional convention, which still holds true today, was that the act of a majority of a quorum is the act of the body.[8] The presumption of parliamentary procedure therefore was a presumption of majority rule. Furthermore, at the constitutional convention, the Framers explicitly considered whether to adopt supermajority requirements and decided against them.

The Articles of Confederation had required a supermajority vote of the states for action on many issues. Under that system, each state was represented by no less than two and no more than seven Members, ARTICLES OF CONFEDERATION art. V, cl. 2, and each state had only one vote, ARTICLES OF CONFEDERATION art. V, cl. 4. The power to engage in a war, enter into a treaty, coin money, borrow or appropriate money, and appoint a commander in chief all required the agreement of nine of the thirteen states, a supermajority. ARTICLES OF CONFEDERATION art. IX, cl. 6. Speaking against a proposal to require a two-thirds vote on commerce regulations at the constitutional convention, Roger Sherman observed that "to require more than a majority to decide a question was always embarrassing as had been experienced in cases requiring the votes of nine States in Congress." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 450 (Max Farrand ed., 1966) (hereinafter FARRAND) (Madison's Notes, Aug. 29). James Wilson made the same point. "Great inconveniences had, [Wilson] contended, been experienced in Congress from the article of confederation requiring nine votes in certain cases." *Id.* at 451 (Madison's Notes, Aug. 29). The Fram-

---

8. "In the Parliament, if the greater part of the Knights of the Shire do assent to the making of an Act of Parliament, and the lesser part will not agree to it, yet this is a good Act or Statute to last *in perpetuum*: and that the Law of *majoris partis* is so in all Counsels, Elections & c. Both by the rules of the Common law and the Civil." WILLIAM HAKEWILL, MODUS TENENDI PARLIAMENTUM: OR THE OLD MANNER OF HOLDING PARLIAMENTS IN ENGLAND 93 (Abel Roper ed., 1671); *see also* GEORGE PETYT, LEX PARLIMENTARIA: OR A TREATISE OF THE LAW AND CUSTOM OF THE PARLIAMENTS OF ENGLAND 165 (1689).

ers, thus, affirmatively decided against supermajority requirements for the passage of legislation.

Later on during the convention, George Mason made a last ditch effort to require a supermajority on one class of legislation. He moved for a proviso that "no law in nature of a navigation act be passed before the year 1808, without the consent of ⅔ of each branch of the Legislature." *Id.* at 631 (Madison's Notes, Sept. 15). Mason's proposal was defeated seven states to three. *See id.* Yet, even if Mason's proviso had been accepted, the Constitution would have said only that passage of a navigation act shall require the consent of two-thirds of each House *until 1808*, implying that the general rule of parliamentary procedure, *i.e.*, the majority-of-a-quorum rule, would apply thereafter. The convention's defeat of Mason's proviso makes even more clear its assumption that the majority-of-a-quorum rule would apply in all cases.

The text of the original Constitution explicitly provides for majority voting in three circumstances. *See* U.S. CONST. art. I, § 5, cl. 1 (quorum); art. II, § 1, cl. 3 (election of President by electors); *id.* (election of President by House). Yet, the existence of these provisions does not imply that whenever the Framers meant to insist on a simple majority they said so in explicit terms. The Framers inserted the quorum clause because the size of a quorum was not dictated by any general rule of parliamentary bodies. The majority requirements governing the election of the President and Vice President address areas that are not a traditional function of a legislative body. Further, the majority requirement was imposed against the backdrop of a two-thirds quorum requirement for these functions. The Framers specifically indicated a majority would suffice to avoid any misapprehension that it had changed the established rule.[9]

The text of the original Constitution also provides for supermajority voting in seven distinct cases,[10] and minority voting in three cases.[11] In all other cases the Constitution is silent. The debates at the constitutional convention indicate that where the Constitution is silent, the Framers made a calculated judgment that a supermajority vote should not be required.

### b. Writings Contemporaneous with the Constitutional Convention

Along with the debates at the constitutional convention, written commentary contem-

---

9. Seven more explicit majority requirements were added by amendment: amend. XII (election of President by electors); *id.* (election of President by House); *id.* (election of Vice President by electors); *id.* (election of Vice President by Senate); amend. XXV, § 2 (Vice Presidential vacancy); amend. XXV, § 4 (declaration of Presidential inability); *id.* (response to Presidential declaration of no inability). All of these requirements pertain only to the unique task of the election or status of the President and Vice President.

10. The original seven exceptions to majority rule were art. I, § 3, cl. 6 (the Senate conviction of an impeached official); art. I, § 5, cl. 2 (expulsion of a Member of either House); art. I, § 7, cl. 2 (overriding a presidential veto); art. II, § 1, cl. 3 (the presence of a quorum in the House for the election of the President); art. II, § 2, cl. 2 (Senate consent to a treaty); art. V (amendment of the Constitution); and art. VII (ratification of the Constitution itself by the States).

The Framers carefully debated each case in which they imposed a supermajority requirement. In each situation, the Framers found good reasons for requiring something more than a simple majority. For example, on impeach-

ment, the Convention first entertained and rejected a proposal by Dickenson that "the Executive be made removable by a ... majority of the Legislatures of individual States." 1 FARRAND at 85 (Madison's Notes, June 2). The Convention, of course, ultimately approved the requirement of a two-thirds vote by the Senate. On expulsions, Madison argued that "the right of expulsion ... was too important to be exercised by a bare majority of a quorum: and in emergencies of faction might be dangerously abused." 2 FARRAND at 254 (Madison's Notes, Aug. 10) (footnote omitted). There was also extensive debate about the two-thirds rule for Senate ratification of treaties, *see id.* at 540 (Madison's Notes, Sept. 7); *id.* at 548 (Madison's Notes, Sept. 8). On amendments, after Elbridge Gerry argued that a simple majority should not be able to "bind the Union to innovations that may subvert the State–Constitutions altogether," *id.* at 557–58 (Madison's Notes, Sept. 10), James Wilson proposed the three-fourths of the states requirement that appears in the Constitution, *id.* at 559 (Madison's Notes, Sept. 10).

11. Art. I, § 5, cl. 1 (adjournment); *id.* (compelling attendance of absent Members); art. I, § 5, cl. 3 (entry of yeas and nays in Journal of Proceedings).

poraneous with ratification indicates that the Framers deliberately adopted the general rule of parliamentary procedure that a bill be considered passed where it receives the support of a majority of the quorum. James Madison observed that, in the constitutional debates, it had been argued "that more than a majority ought to have been required for a quorum, and in particular cases, if not in all, more than a majority of a quorum for a decision." THE FEDERALIST No. 58, at 396 (James Madison) (Jacob E. Cooke ed., 1961). In explaining why supermajority votes were inappropriate for the passage of legislation, Madison said:

> In all cases where justice or the general good might require new laws to be passed, or active measures to be pursued, the fundamental principle of free government would be reversed. It would be no longer the majority that would rule; the power would be transferred to the minority. Were the defensive privilege limited to particular cases, an interested minority might take advantage of it to screen themselves from equitable sacrifices to the general weal, or in particular emergencies to extort unreasonable indulgences.

*Id.* at 397.

Alexander Hamilton also defended the Convention's decision to jettison the supermajority system of the Articles of Confederation, declaring that in votes on ordinary legislation the Constitution should not "give a minority a negative upon the majority." THE FEDERALIST No. 22, at 140 (Alexander Hamilton). He explained that,

> The public business must in some way or other go forward. If a pertinacious minority can controul the opinion of a majority respecting the best mode of conducting it; the majority in order that something may be done, must conform to the views of the minority; and thus the sense of the smaller number will over-rule that of the greater, and give a tone to the national proceedings. Hence tedious delays—continual negotiation and intrigue—contemptible compromises of the public good. And yet in such a system, it is even happy when such compromises can take place: For upon some occasions, things will not admit

of accommodation; and then the measures of government must be injuriously suspended or fatally defeated. It is often, by the impracticability of obtaining the concurrence of the necessary number of votes, kept in a state of inaction. Its situation must always savour of weakness—sometimes border upon anarchy.

*Id.* at 141. Like Madison, Hamilton counseled that "much ill may be produced, by the power of hindering the doing what may be necessary, and of keeping affairs in the same unfavorable posture in which they may happen to stand at particular periods." *Id.*

Madison and Hamilton, thus, explicate the rationale that motivated the Framers to reject supermajority requirements—a desire to protect majority rule in the final passage of legislation and to facilitate legislative change on substantive issues.

The Framers, however, were concerned about the tyranny of the majority. Madison recognized that a temporary majority would exercise power "adverse to the rights of other citizens." THE FEDERALIST No. 10, at 57 (James Madison). He said: "To secure the public good, and private rights, against the danger of such a faction, and at the same time to preserve the spirit and the form of popular government, is then the great object to which our enquiries are directed." *Id.* at 61. To prevent the tyranny of the majority, Madison, along with the other Framers, established a system of checks and balances— such as the presidential veto, which can only be overcome by a two-thirds majority of Congress. It was believed that these checks and balances would operate to restrain the majority more effectively than supermajority requirements for the passage of legislation, which had already failed under the Articles of Confederation. Recognizing that the presentment clause mandates that any bill receiving the vote of a majority of the Members be presented to the President, thus, does not require acceptance of the insupportable proposition that a majority must always prevail. Other checks and balances to restrain the majority are permissible and, in fact, consistent with the Framers' intent.

844

#### c. The Rejection of a Legislative Supermajority Requirement

Despite the evidence of the Framers' intent from their debates at the constitutional convention and their contemporaneous writings, the Clerk argues that where the Constitution contains no explicit voting requirement, the Framers intended the House itself to decide the voting requirement for the passage of such legislation. According to the Clerk, majority rule for the passage of legislation is simply a default position. But this premise ignores the Framers' concerns about supermajority requirements.[12]

The Clerk suggests that a legislative supermajority requirement is somehow different from a constitutional supermajority requirement, claiming it is more consistent with majority rule since the majority itself can pass and repeal a legislative supermajority requirement. This argument ignores the fact that the Framers desired to preserve majority rule over substantive decisionmaking on the final passage of legislation. Allowing legislative supermajority requirements interferes with majority rule over substantive decisionmaking on the final passage of legislation. For, indeed, it is not clear that, where there is a majority in favor of a tax increase, the same majority will always favor repeal or amendment of a legislative supermajority requirement.

Consider the following hypothetical: 218 of 435 legislators favor a tax increase, a majority. Rule XXI(5)(c), in its present form, is in effect. One legislator who would vote in favor of a tax increase refuses to support a move to amend, repeal, or suspend Rule XXI(5)(c) on the ground that tax increases impose such a great burden on the citizenry that she believes the passage of tax increases should require more than majority support. The legislators who do not support the increase similarly refuse to support an attempt to amend or repeal the Rule. A vote to enact a tax increase into law receives only 218 votes, thus failing to become law because

the supermajority requirement remains in effect. It is just this situation that was rejected by the Framers, who specifically decided not to require a supermajority over decisionmaking in most substantive areas. The Framers debated, decided, and enumerated the specific circumstances when a supermajority is required. Any changes to the list of situations warranting supermajority votes must come through constitutional amendment—not by a simple decision of the House of Representatives.

#### d. Past Practice

Past practice also demonstrates that, until now, the Members always have acted as if they were bound by the vote of a majority of a quorum. Indeed, the House of Representatives, without exception, has followed the majority-of-a-quorum rule since its beginning. Thomas Jefferson's *Manual of Parliamentary Practice,* prepared while Jefferson presided over the Senate as John Adams's Vice President, makes this commitment explicit:

> The voice of the majority decides. For the lex majoris partis is the law of all councils, elections, &c. where not otherwise expressly provided. *Hakew.* 93. But if the House be equally divided, "semper presumatur pro negante," that is, the former law is not to be changed but by a majority. *Town col.* 134.

Thomas Jefferson, A Manual of Parliamentary Practice, § 41, *reprinted in* Jefferson's Parliamentary Writings, 407 (Charles T. Cullen ed., 1988). In 1837, the House adopted Jefferson's manual for the conduct of its own proceedings, and Jefferson's rule continues to operate to this day, except where it has been amended by later rules constitutionally promulgated by the House.

Rule XXI(5)(c) marks the first time the House has attempted to avoid the majority-of-a-quorum rule for the passage of legisla-

---

**12.** *Dyer v. Blair*, 390 F.Supp. 1291 (N.D.Ill.1975) (written by now-Justice Stevens, who was then a Circuit Judge writing for a three-judge District Court panel), which the Clerk cites as support for this argument, is factually distinct from the case at bar. *Dyer* involved the vote required for state legislators to ratify an amendment to the Constitution. The federalism concerns that underlay that decision are not present here. *Dyer's* statements about the meaning of a constitutional silence on voting requirements, *id.* at 1306, thus, are inapposite to this case.

tion. Past practice, of course, does not determine what is constitutionally required; nevertheless, it provides good evidence that lawmakers have always assumed that the majority-of-a-quorum rule must govern.

### 2. Supreme Court Precedent

Although no Supreme Court decision has directly addressed the question whether a bill that receives the vote of a majority of the Members must be presented to the President, Supreme Court precedent provides guidance on the question. It demonstrates that the Court has understood the Constitution to require that bills that receive the vote of a majority indeed must be presented to the President; in other words, "majority rule" has been accepted without question by the Court.

### a. Construing the Presentment Clause

In *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), in the course of evaluating the constitutionality of the legislative veto, the Court explained the formulaic nature of the structure mandated by the presentment clause. In the course of its explanation, the Court repeatedly stated that a simple majority is all that is required for passage of legislation. The Court first found that the Framers "provid[ed] that no law could take effect without the concurrence of the prescribed *majority* of the Members of both Houses." *Id.* at 948, 103 S.Ct. at 2783 (emphasis added). The Court then noted that, providing for Senate approval of treaties, "Art. II, § 2, requires that two-thirds of the Senators present concur ... *rather than the simple majority required for passage of legislation.*" *Id.* at 956 n. 21, 103 S.Ct. at 2786 n. 21 (emphasis added). Finally, the Court stated that the presentment clause:

> requires action in conformity with the express procedures of the Constitution's prescription for legislative action: passage *by a majority* of both Houses and presentment to the President.

*Id.* at 958, 103 S.Ct. at 2787 (emphasis added). The Court also noted that not even

Congress and the President acting together could change the requirements of the presentment clause. The presentment clause "represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought, and exhaustively considered, procedure." *Id.* at 951, 103 S.Ct. at 2784.

The Court's explanation of the requirements of the presentment clause in *Chadha* is consistent with its analysis in *United States v. Ballin*, 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321 (1892). In *Ballin*, the Court answered two questions: whether the Constitution prescribed a particular method for determining whether a majority constituting a quorum was present and whether the act of a majority of the quorum present, but less than a majority of the full House, had been sufficient to pass a bill. Although *Ballin* is not a presentment clause case, it sets out the methodology that determines the meaning of the clause.

The Court in *Ballin* makes it clear that where the Constitution is silent on voting requirements, the general law of parliamentary bodies applies:

> [T]he general rule of all parliamentary bodies is that, when a quorum is present, the act of a majority of the quorum is the act of the body. This has been the rule for all time, except so far as in any given case the terms of the organic act under which the body is assembled have prescribed specific limitations.... No such limitation is found in the Federal Constitution, and therefore the general law of such bodies obtains.

*Id.* at 6, 12 S.Ct. at 509. This language indicates that unless the Constitution specifically provides otherwise, the Constitution embodies the general rules of parliamentary procedure. Because the presentment clause provides *no explicit rule for counting votes* for and against the final passage of bills, "the general rule of bodies obtains," and "the act of a majority of the quorum is the act of the body," as decided by the Framers, indicated in *Ballin* and reaffirmed in *Chadha*.[13]

---

13. Appellees and amicus mistakenly rely on *Gordon v. Lance*, 403 U.S. 1, 6, 91 S.Ct. 1889, 1892,

29 L.Ed.2d 273 (1971) (finding that West Virginia's requirement of a three-fifths majority of

It should be noted, however, that construing the presentment clause in accord with the general rules of parliamentary procedure (such that "passed" means passed by a majority of a quorum) does not invalidate *all* supermajority requirements. Requiring a supermajority to pass a bill into law can be distinguished from procedural rules—like the Senate cloture rule—that require a supermajority to bring an issue to a vote. Although such supermajority requirements may hinder or help a bill to become law, these procedural rules do not explicitly conflict with the presentment clause requirement that a bill that has passed be presented to the President.

For example, Clause 2(h)(2) of House Rule XI authorizes committees to establish a quorum of only one-third for the reporting of legislation. Thus, a bill in committee that may enjoy the support of more than one-half of the House Members may nonetheless die in committee if a majority of the one-third quorum so chooses. While this Rule affects whether and when a bill comes to a vote, it does not purport to redefine what counts as passage of a bill or to alter the House's duty to "present" to the Senate or the President any bill that has commanded a majority vote of a quorum of the House.[14] The presentment clause, by virtue of the Framers' adoption of the general rule of parliamentary procedure, merely defines the number of votes necessary to enact a bill into law. It does not speak to these other procedural matters.

### b. Three Co-equal Branches of Government

Not only does House Rule XXI(5)(c) conflict with the general rule of parliamentary procedure outlined in *Ballin* and reiterated in *Chadha*, it also changes the finely tuned balance of power between Congress and the executive. By redefining what it means for a tax bill containing a tax increase to "pass," House Rule XXI(5)(c) alters the responsibilities of the executive and opens the door for either House of Congress to use the rule-making power to adopt other requirements for the passage of legislation which destroy the system of checks and balances designed by the Framers.

Professor Jed Rubenfeld explains that reading the word "passed" in the presentment clause to embody majority rule supports the following principles that are fundamental to our constitutional system of checks and balances: "(1) every Senator and Representative gets one equal vote; (2) only the votes of Senators and Representatives count; (3) the relative power of the small and large states to pass laws cannot be changed; (4) no state can be given the power to veto legislation passed by a majority vote of the chamber; and (5) neither chamber can transform the legislative process from a two-tiered process with a decisive presidential veto, into a two-thirds-two-thirds process in which the President's veto is a virtual formality." *See* Rubenfeld, note 1 *supra*, at 85. According to Rubenfeld, allowing Congress to decide for itself what constitutes the passage of a bill calls each of these principles into question. For example, as mentioned in the introduction, if Congress could decide what constitutes passage of a bill, not only could Congress transform the President's veto power, Congress could also make voting rules like a ninety percent majority rule that would give one state effective veto power over legislation.

---

voters to increase tax rates or bonded indebtedness did not violate the Fourteenth Amendment). That case deals with the constitutionality of *state* supermajority requirements under the equal protection clause, not the presentment clause. *Gordon* simply does not address the federal legislative process.

**14.** Judge Joyce Hens Green recognized the distinction between procedural rules that affect which bills reach the entire House and rules that alter what constitutes the passage of a bill. In *Page v. Dole*, Civ. No. 93–1546 (D.D.C. Aug. 18, 1994), a challenge to the Senate's cloture rule,

which she dismissed for lack of standing, she suggested that impermissible vote dilution might result if Congress imposed a supermajority requirement for passage of a bill but did not result from the Senate's supermajority cloture rule. Rejecting the plaintiff's argument that he had standing because the Senate cloture rule resulted in impermissible dilution of his Senator's vote, she said, "To put it more baldly, Senate Rule XXII [the cloture rule] is *not* the same as a vote for or against legislation." *Page*, slip op. at 15 (emphasis added).

The confirmation clause example (also cited in the introduction) illustrates the ramifications outside the presentment clause context of a decision upholding Rule XXI(5)(c). *See* Bloch, note 2 *supra*. Professor Bloch provides a striking demonstration of how Congress could use the rulemaking clause to increase its own power at the expense of the executive. The Constitution states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States." U.S. CONST. art. II, § 2, cl. 2. The Constitution does not specify the number of votes required for confirmation, so if Rule XXI(5)(c) is constitutional, the Senate could use the rulemaking clause to require that three-fifths of its members, rather than one-half, vote in favor of confirmation of a presidential appointee. The Senate thereby could essentially take over the appointment process from the President. Acceptance of the Clerk's argument that Congress can use the rulemaking clause to change the number of votes required to pass a law amounts to acceptance of the proposition that each House of Congress can fundamentally alter the balance of power established by the Framers.

In sum, House Rule XXI(5)(c) conflicts with Supreme Court precedent, which recognizes that, consistent with the Framers' intent, the Constitution adopted the general rule of parliamentary procedure, the act of a majority of a quorum is the act of a body. By altering this fundamental principle of parliamentary bodies, House Rule XXI(5)(c) works an unconstitutional change in the procedure that governs the relationship between Congress and the executive, and it opens the door for Congress to make further changes in our "finely wrought" system of checks and balances.

## CONCLUSION

Because the majority opinion fundamentally alters standing doctrine to avoid reaching a significant constitutional question, I dissent. Under the law of this circuit on standing in "vote dilution" cases, this court has jurisdiction to reach the merits of appellants' claim. The constitutionality of House Rule XXI(5)(c) is not a question that can be left unanswered by this court. By granting itself the power to change the number of votes required to enact a bill into law, the House violated the command of the presentment clause, which requires that all bills that receive the vote of a majority of a quorum of each House be presented to the President. The House's action conflicts with the intent of the Framers and Supreme Court precedent. Allowing this Rule to stand permits Congress to use the rulemaking clause as a tool to redefine its relationship to the executive, a result that should not be countenanced by this court.