[No. 32108. *En Banc.* May 10, 1952.]

THE STATE OF WASHINGTON, *on the Relation of Charles W. Hodde et al., Plaintiff,* v. THE SUPERIOR COURT FOR THURSTON COUNTY, *Charles T. Wright, Judge, Respondent.*[1]

[1]Reported in 244 P. (2d) 668.

The Attorney General, George Kahin, and Harold Shefelman, Special Assistants (Max R. Nicolai, of counsel), for relators.

Josef Diamond (of Lycette, Diamond & Sylvester), for respondent.

FINLEY, J.—Chapter 36, p. 60, Laws of 1947 (Rem. Supp. 1947, §§ 8207-1, et seq.) authorized the creation of the Washington state legislative council. The council was first set up and began functioning in 1947. It has been reconstituted and its functions continued by the regular legislative sessions in 1949 and again in 1951. Over a period of years, the council has appointed a subcommittee on state and local government, and certain duties have been delegated to it.

John B. Gillespie, a captain of the police department of the city of Aberdeen, Washington, was served with a subcommittee subpoena on February 28, 1952, requiring him to appear subsequently at a hearing scheduled to be held by the subcommittee on state and local government, and "then and there to testify as a witness." He obtained a temporary restraining order from the Thurston county superior court. It enjoined further investigating activities and the holding of public hearings by the subcommittee relative to local crime conditions in Aberdeen. After hearing argument on the matter, the Honorable Charles T. Wright, judge of the superior court for Thurston county, Washington, indicated an intention to issue a temporary injunction, or an injunction *pendente lite*, to prevent further legislative in-

vestigation and the holding of public hearings relative to local crime conditions in Aberdeen and elsewhere. Thereupon, counsel for the subcommittee applied to the supreme court for a writ prohibiting issuance of the injunction as contemplated by the superior court for Thurston county. The chief justice of the supreme court issued an alternative writ of prohibition on March 21, 1952. It required that cause be shown why the permanent writ of prohibition should not issue as prayed for by counsel for the subcommittee.

The question in this case is whether a writ of prohibition should issue, permanently preventing the Thurston county court from enjoining the investigation and the public hearings relative to local crime conditions at the county and city level, and particularly as such hearings might affect Mr. Gillespie.

Counsel for Mr. Gillespie contends that the legislative council and its subcommittee on state and local government are not validly constituted because the statute authorizing the creation of the council provides for its creation and continuance merely between sessions of the legislature, and that two special sessions of the legislature were held in 1951 after the regular 1951 session. Specifically, the contention of Mr. Gillespie is that a special session of the legislature intervened after the adjournment of the regular 1951 session; that the council, created at or during the regular 1951 session, therefore ended or ceased to exist validly at the beginning of the first special session in 1951; that thereafter, the council, as such, was not reconstituted at either the first or second extraordinary sessions of the legislature in 1951, that members were not appointed to the council, and that the council, at present, is legally nonexistent.

Counsel for Mr. Gillespie further contends that the language of chapter 36, *supra*, is not broad enough in scope to authorize the program of investigation and the public hearings contemplated by the subcommittee relative to local crime conditions. It is further contended that Gillespie has been served with a subpoena requiring him to testify on

matters concerning local government and as to private personal and business affairs. It is also contended by him that being required to testify as a witness at the contemplated public hearing, as it will be conducted, will constitute an invasion of his rights of privacy. Finally, it is contended that, under the circumstances in this case, a writ of prohibition does not lie for two reasons: (1) that an adequate remedy at law is available; and (2) that the Thurston county superior court would not be acting without or in excess of jurisdiction in enjoining the activities of the subcommittee.

We think that the contentions made by counsel in behalf of Mr. Gillespie—and technically, in behalf of Judge Wright —are without merit, and that the permanent writ of prohibition should issue.

A discussion of the historical background of legislative investigations and hearings may be of some interest and assistance before we consider separately the contentions of Mr. Gillespie, referred to above. Much of such historical background relates to activities of committees of the United States Congress. Precedents for legislative investigations may be found in very early records of the British parliament and in the records of legislative bodies of the American colonies. Potts, Power of Legislative Bodies to Punish for Contempt, 74 U. of Pa. L. Rev. 691, 708, *et seq.* (1926). The first legislative investigation by the United States Congress (conducted by the House of Representatives) occurred in 1792 when the conduct of military affairs, and the expenditure of appropriations in connection therewith, by General St. Clair was investigated. 2 Ann. Cong. 490 (1792). General Andrew Jackson and his Florida campaigns was the target of the first Senate investigation. 33 Ann. Cong. 76 (1818). For many years, various committees of Congress have investigated a great variety of matters pertinent to affairs of government or contemplated legislation. No complete tabulation of the investigations exists. It is estimated that there have been upwards of six hundred investigations made by Congress. McGeary, Congressional Investigations: Historical Devel-

opment, 18 University of Chicago L. Rev. 425. It is a fact that, for almost a hundred years following the St. Clair inquiry, Congressional investigations flourished, "virtually free from judicial supervision or control." Morgan, Congressional Investigations and Judicial Review: Kilbourn v. Thompson Revisited, 37 Calif. L. Rev. 556 (1949). The first significant judicial obstacle or restraint regarding Congressional investigations is found in the decision of the United States supreme court in *Kilbourn v. Thompson*, 103 U. S. 168, 26 L. Ed. 377, wherein plaintiff Kilbourn's contentions were upheld, and the court criticized the resolution by which the Congressional committee was created for its failure to contain a "hint of any intention of final action by Congress on the subject." The court further inquired as to whether the particular investigation was to be "simply a fruitless investigation into the personal affairs of the individuals . . .," and said, ". . . If so, the House of Representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country." (pp. 194, 195) Under this case, the scope of legislative investigatory power appears to have been narrowed for a period of years until the advent of the decision in *McGrain v. Daugherty*, 273 U. S. 135, 174, 71 L. Ed. 580, 47 S. Ct. 319, 50 A. L. R. 1, wherein Justice Van Devanter, in an unanimous opinion, said:

"We are of opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function . . .

"A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed. All this was true before and when the Constitution was framed and

adopted. In that period the power of inquiry— with enforcing process—was regarded and employed as a necessary and appropriate attribute of the power to legislate—indeed, was treated as inhering in it. Thus there is ample warrant for thinking, as we do, that the constitutional provisions which commit the legislative function to the two houses are intended to include this attribute to the end that the function may be effectively exercised.

"The contention is earnestly made on behalf of the witness that this power of inquiry, if sustained, may be abusively and oppressively exerted. If this be so, it affords no ground for denying the power. The same contention might be directed against the power to legislate, and of course would be unavailing. *We must assume, for present purposes, that neither house will be disposed to exert the power beyond its proper bounds, or without due regard to the rights of witnesses.*" (Italics ours.)

In the *Daugherty* case the view was expressed that weight should be accorded by the courts to a presumption that a legislative investigating committee would not act invalidly or beyond the scope of its power and authority.

From the foregoing, we must conclude that investigations by legislative committees, as such, are not a recent innovation; that many functions and activities are proper; and that, when acting within the scope of their authority concerning matters reasonably germane to potential legislation, judicial supervision or review is inappropriate. This assumes the usual garden variety of legislative investigation. Exploration into the field of crime may be off the "norm," particularly when legislative policy, or the operations of a committee, conflicts with the policy inherent in all branches of government, and in all of our established and approved social institutions relative to the protection of the rights of individuals. Modern invention, the development of new and, currently, somewhat phenomenal media for transmission of information, and the utilization or adaptation of such media in legislative investigations, again may be somewhat "off the norm."

In connection with the foregoing, we quote at some length from a seemingly apt article in the January, 1952, issue of the American Bar Association Journal (p. 18), as follows:

"Let us now look at the proceedings of congressional investigative committees. Their investigations admittedly are not judicial in nature; their purpose is to explore but not to judge except as to whether legislation should be drawn. Historically, their functions have been, first, to seek information that will enable Congress to legislate wisely; and second, to determine whether executive and administrative agencies are properly performing their functions with respect to the enforcement of law or the expenditure of public funds.

"Certainly no one would deny the power of Congress to investigate. Indeed, congressional investigations are among the most important of legislative functions. When, however, congressional investigations assume the aspect of an individual trial, without the traditional safeguards of regular court proceedings, then the question becomes one of how to preserve the constitutional rights of citizens without impairing the functions of Congress. The question is not the objectives of congressional committees. The question is one of method and scope. . . .

"It is when congressional investigations seek to inquire into questions of personal wrongdoing, as distinguished from the impersonal questions of broad public policy, that the fundamental rights of individuals seem most likely to be infringed and therefore need the greatest protection. . . .

"It has been suggested that a forward step in this direction would be the adoption of a code of procedures for the guidance of congressional committees, governing the conduct of hearings and treatment of witnesses to assure a fair hearing. The Association of the Bar of the City of New York has advocated establishing such a code."

We are impressed, and quote from another timely article found in the February, 1952, issue of the Journal of the American Judicature Society (p. 131), as follows:

"From the viewpoint of judicial administration, a congressional committee investigation is neither beast, bird nor fish. Its proceedings are not judicial, for no issues are before it for decision. It is not a grand jury, for its object is not to indict. It is not legislative, for its recommendations do not have the force of law until they have passed through regular legislative channels. Yet it has some of the characteristics of all three, all of which may be seen in the recent Kefauver committee investigation . . .

"The kinship of a committee investigation to grand jury

proceedings depends entirely upon the subject-matter under investigation. If it is such a matter as the adequacy of safety practices in coal mines, or the desirability of additional financial aid to Europe, there is little or no connection or similarity. If it is searching out facts regarding organized crime, unAmerican activities, fraud in national defense contracts, or the Teapot Dome oil scandal, then it has a great deal in common with a grand jury. About the only difference between the work of the Kefauver committee and that of a grand jury was the rather tenuous one that the committee itself did not indict. It did, however, turn its findings over to other authorities which followed through with indictments and prosecutions, and the result was just about the same to the witness-defendants involved . . .

"When congressional committees investigate problems of inland waterways, farm prices, industrial working conditions, and a thousand other matters of public interest and concern, they can render an admirable public service by educating the public as to those matters through publicity by all available means, including radio and television. When they are investigating the commission of crimes, they ought to have no more power over their witnesses than any other criminal investigating body, and they should be subject to the rules that have governed those investigations throughout Anglo-American legal history."

In the field of judicial activity and the administration of justice by the courts, present operations are a far cry from the star chamber proceedings in early English legal history. The Spanish Inquisitions, the public trials and executions of the French Revolution, with their contemporary counterparts today in some countries other. than our own, seem quite abhorrent to our sense of fair play. Over a period of several centuries, a sense of the sanctity of individual human rights has asserted itself in our American way of life. Protections and safeguards relative to such rights have become recognized. They are well established and still are developing to a point of greater refinement in the administration of justice by our courts. The history of such things should and may provide effective and compelling precedents in the legislative field or to those individuals responsible for the conduct of legislative investigations and hearings. We believe the judiciary should indulge and emphasize a pre-

sumption to that effect. The legislature is a coordinate and equal department of government.

The doctrine of judicial review respecting legislative enactments is so well settled in our system of government that it is no longer open to serious question, although by some writers it has been characterized or labeled—somewhat critically, to say the least—as an unwarranted assumption of judicial supremacy by the courts, or as "government by the judiciary." See I Boudin: Government by Judiciary. The fact is that the judiciary, within recognized limitations, pursuant to well-established principles of statutory interpretation, *does* construe or interpret acts of the legislature. It is an accepted fact that legislation will be reviewed and tested by the courts as to its constitutionality. The gap between these recognized and accepted judicial functions and the review of other, and perhaps somewhat different, legislative activities is not an unsurmountable one.

The impact of recent developments in the field of legislative investigation could set at naught the protections and safeguards of individual rights, so laboriously staked out over the centuries in the judicial field of activity; that is, in the ordinary administration of justice by the courts. The point may very well be reached that the sense of fair play inherent in the Golden Rule—that we should do unto others as we would have them do unto us—may necessitate judicial review relative to some aspects of legislative investigations and hearings to make certain that well-accepted precedents in the judicial forum for the protection of individual rights actually carry over into the legislative field, and are recognized and applied there for the protection of individual rights. In *Sinclair v. United States,* 279 U. S. 263, 292, 73 L. Ed. 692, 49 S. Ct. 268, the supreme court said:

"It has always been recognized in this country, and it is well to remember, that few if any of the rights of the people guarded by fundamental law are of greater importance to their happiness and safety than the right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of their personal and private affairs."

■ We come now to a consideration of the contentions of Mr. Gillespie in the case at bar. The legislative council was duly constituted at the regular 1951 session of the legislature. We think the legislature, by the statute as enacted (chapter 36, Laws of 1947), contemplated a continuing organization—and that the council should function for a period of two years between regular sessions of the legislature—irrespective of any intervening special session.

As to the contention that chapter 36, *supra*, does not authorize an inquiry into local crime conditions, we quote § 2 of chapter 36, which reads as follows: (p. 61)

"Sec. 2. The council shall have the following powers and duties: (1) To perform, either through the council as a whole or through subcommittees thereof, all duties and functions customarily delegated to special interim legislative committees;

"(2) To examine and study the administrative organization and procedures of the state government, its offices, boards, committees, commissions, institutions and other state agencies and to make recommendations, where found advisable, directed to the elimination of unnecessary overlapping or duplication of functions, procedures and expenditures, and to the promotion of economy and efficiency in state government;

"(3) To make current examination and reports concerning the current condition of all state funds, appropriations and other state moneys; concerning whether or not such appropriations are being currently expended for the purposes and within the statutory restrictions provided by the Legislature; and concerning the current availability of revenue to meet expenditures under appropriations;

"(4) To make such other studies and examinations of the state government and its state agencies as it may find advisable and to hear complaints, hold hearings, gather information and make findings of fact with respect thereto;

"(5) To receive messages and reports in person or in writing from the Governor or any other state officials and to attend generally to any and all business addressed to or affecting the Legislature during the interim between *regular* legislative sessions; and

"(6) To make reports from time to time to the members of the Legislature and to the public with respect to any of its findings or recommendations. The council shall keep

complete minutes of its meetings. The council shall make and distribute its final report to the members of the ensuing Legislature at least ten days prior to the convening of the Legislature.

" (7)  To cooperate, act and function with similar councils or committees of other states, with the Council of State Governments, and with other interstate research organizations." (Italics ours.)

We note that the council, as a whole or through subcommittees thereof, is authorized to perform all duties and functions customarily delegated to special interim legislative committees.  Even a cursory examination of the history of legislative councils and legislative committees in other states indicates that inquiry into local crime conditions is *customary* and well established as a proper function of the legislative branches of government.  If anything further need to be said in this connection, we refer to chapter 36, § 2 (4), p. 61, *supra,* which clearly authorizes studies and examinations of state government and its other agencies, as the council may find desirable.  Under this provision of the statute, a legislative committee would be authorized to hear complaints, hold hearings, gather information, and make findings of fact.

Relative to the last-mentioned statutory provision, we find that municipal corporations are regarded as subordinate subdivisions of state government. In *State v. Aberdeen,* 34 Wash. 61, 66, 74 Pac. 1022, we said:

"A municipal corporation is a subordinate subdivision of the state government. It derives its existence, powers, and privileges from the state. The power to collect a liquor license tax was conferred by the state, as an incident to police powers pertaining to government. The city, therefore, became an agency of the state in collecting the money."

In *Hagerman v. Seattle,* 189 Wash. 694, 697, 66 P. (2d) 1152, 110 A. L. R. 1110, we said:

"Members of municipal departments in the exercise of public governmental duties are agents of the state and not of the city."

In *State v. Vantage Bridge Co.,* 134 Wash. 568, 572, 236 Pac. 280, we said:

"The counties are but local subdivisions of the state and are created by the sovereign power of the state . . . They are created with a direct and exclusive reference to the general policy of the state and are in fact but a branch of the general administration of that policy."

A copy of the subpoena served upon Mr. Gillespie is referred to as "Exhibit H," and attached to a supplemental application to the supreme court for a writ of prohibition. The subpoena reads as follows:

"BEFORE THE LEGISLATIVE COUNCIL, SUBCOMMITTEE ON STATE AND LOCAL GOVERNMENT

"SUBPOENA

"THE WASHINGTON STATE LEGISLATIVE COUNCIL,

"To:  CAPTAIN JOHN GILLESPIE

"Police Department

"Aberdeen, Wash.

"You are hereby commanded to be and appear at Washington State National Guard Armory, Aberdeen Washington, at 11 o'clock in the forenoon of the 10th day of ————, 1952, then and there to testify as a witness at a hearing being conducted at such time by the WASHINGTON STATE LEGISLATIVE COUNCIL, SUBCOMMITTEE ON STATE AND LOCAL GOVERNMENT

"and to remain in attendance before said Committee until discharged, and HEREIN FAIL NOT AT YOUR PERIL.

"Dated at SEATTLE, WASHINGTON, this 13th day of February, 1952.

"ALBERT D. ROSELLINI

"Subcommittee on State and Local Government, Washington State Legislative Council, by Albert D. Rosellini, Chairman, 1111 Smith Tower, Seattle 4, Washington

"EXHIBIT ————

"Served on Captain John Gillespie at 4 P. M. Feb. 28, 1952.

"R. F. Simmons Sheriff"

Apparently it is the contention of Mr. Gillespie that the subpoena served upon him specifically requires him to testify as to personal and private matters. He strenuously objects to this. But there is no specific language in the subpoena indicating definitely that Mr. Gillespie's private, personal or business affairs will be inquired into. It merely directed him to appear as a witness at a scheduled hearing.

The language of the subpoena quoted above refutes particular contentions made in behalf of Mr. Gillespie relative to the subpoena and its alleged contents. In this connection, we are simply asked to speculate that the scope of the hearing will be so broad as to infringe upon Mr. Gillespie's individual rights. We will not do so at the very threshold of the hearing and before the complainant has appeared or taken the witness stand.

The gist of Mr. Gillespie's contentions that his rights of privacy will be invaded seems to be that the subcommittee intends to go beyond its authority and that the questioning will go beyond the bounds of relevancy and materiality. In this connection, he contends that the manner and circumstances under which the hearing will be conducted will infringe upon his personal rights of privacy. But again, we will not speculate as to what might happen; and we will not say, as a matter of law, that testimony which the subcommittee might seek to elicit from Gillespie would not be reasonably germane to legislative enactments which, possibly or probably, might be contemplated seriously by the subcommittee. Neither can we speculate respecting the manner or the circumstances under which the hearing would be conducted and in this connection say that, as a matter of law, there would or could be infringement upon Mr. Gillespie's individual rights. At the present time, Mr. Gillespie has merely been served with a subpoena. On its face, it is not unusual. Actually, nothing else has happened to Mr. Gillespie as a result of operations of the subcommittee. Mr. Gillespie has not even made an appearance as a witness at the hearing about which we are asked to speculate. He has not been questioned. At the present stage of the proceedings of the subcommittee, no specific individual rights of Mr. Gillespie appear to us to have been violated. In the case before us, as it is now presented, we will not speculate in advance as to what might happen. We will not presume that the subcommittee is going to act in an irregular or illegal manner.

■ It has long been the rule in this state that it is to be presumed that public officials act, or will act, within the limits of their authority and in good faith. The burden of impeaching their actions rests upon the attacker. *Blade v. LaConner,* 167 Wash. 403, 9 P. (2d) 381. Essentially the same rule and the same conclusion was reached in *United States v. Bryan,* 72 Fed. Supp. 58, 62, regarding proceedings of a Congressional investigating committee. In the *Bryan* case the court quoted from *Barry v. United States ex rel. Cunningham,* 279 U. S. 597, 619, 73 L. Ed. 867, 49 S. Ct. 452, 457, as follows:

" 'The presumption in favor of regularity, which applies to the proceedings of courts, cannot be denied to the proceedings of the Houses of Congress, when acting upon matters within their constitutional authority.' "

In *International Railway Company v. Mahoney,* 271 App. Div. 283, 64 N. Y. S. (2d) 854, 856, the court said:

"Except in an unusually clear case, a Commission should not be checked at the threshold of its investigation . . . thus rendering its investigation to a large extent abortive."

In *Attorney General v. Brissenden,* 271 Mass. 172, 179, 171 N. E. 82, 86, the court wisely observed:

"Scarcely any matter is of more general public interest or concerns more intimately the safety and protection of the individual or the fair name of the community than an efficient, honest and adequate police force."

In *Rushing v. Tennessee Crime Commission,* 173 Tenn. 308, 319, 117 S. W. (2d) 4, the supreme court of Tennessee said:

"We know of no constitutional restraint upon the power of the State to inquire into the conduct of State, county and municipal officials in their management of public affairs and to examine the public records in their possession. Assurance of Article 1, Section 7, of the Constitution against unreasonable searches and seizures is not involved in a public inquiry into official conduct and the examination of official records. No provision of the Constitution can be invoked by public officials to enable them to suppress facts connected with public business under their control."

Legislative inquiry into the matter of law enforcement has produced startling results, highly beneficial to the public, in several states. This was the experience of the Hofstadter Legislative Committee, investigating police administration in New York City in the early thirties. The hearings revealed that Sheriff Thomas M. Farley of New York county amassed $360,660.34 in about six years; that Under Sheriff Peter J. Curran of New York county deposited $662,311.11 in a five-year period; Assistant Deputy Sheriff Joseph Flaherty of New York county got together $20,000 in four and one-half months; Thomas J. Kelly, deputy chief police inspector, in charge of the borough of Queens, amassed $35,000 in five years; Inspector Thomas W. Mullarkey, who commanded one of Kelly's two Queens districts, banked $27,000 in three years; plain-clothes patrolman Dennis Wright of the Bronx accumulated $99,000 in five years; and police officer James J. Quinlivian of New York City, who was assigned to the vice squad, had an annual income of $80,000. More recently, at a hearing of the Kefauver committee, Captain Daniel A. Gilbert, at that time chief-investigator for the Cook county (Chicago), Illinois State Attorney's office, owned up rather proudly to his title of "the richest cop in the world." 55 Dickinson Law Review 246 (The Kefauver Investigation in Perspective).

It must be understood that our reference to some of the experiences of legislative committees in other parts of the country is not intended as a criticism, or as a reflection in the slightest degree, or otherwise, relative to Mr. Gillespie or the Aberdeen police department. In this connection, furthermore, we express no opinion as to whether the subcommittee of the Washington state legislative council should or should not conduct an investigation in Aberdeen or elsewhere. Likewise, we express no opinion as to whether Mr. Gillespie should or should not be called as a witness.

We shall now consider whether a writ of prohibition lies. While there may be some doubt as to whether the Thurston county superior court had the requisite power or jurisdiction to entertain the action seeking to enjoin the

subcommittee, there is no doubt in our minds that, under the circumstances in the case at bar, the trial court would be acting in excess of its jurisdiction in issuing a temporary injunction *pendente lite*. In *Public Service Commission v. Eighth Judicial Dist. Court,* 61 Nev. 245, 250, 123 P. (2d) 237, the supreme court of Nevada issued a writ of prohibition stopping the district court from enjoining the public service commission from holding a contemplated hearing, and said:

"In the absence of fraud or gross abuse, equity cannot interfere with, or in advance restrain, the discretion of an administrative body's exercise of legislative powers."

In *State ex rel. Munro v. Superior Court,* 35 Wn. (2d) 217, 220, 212 P. (2d) 493, we said:

"A writ of prohibition may issue to prevent a court from granting an injunction where, though having jurisdiction for certain limited purposes, it would, in doing so, go beyond such jurisdiction."

As to the contention that the subcommittee has a plain, speedy and adequate remedy in the ordinary course of law, and that prohibition does not lie for such reason, we refer to *State ex rel. O'Brien v. Police Court,* 14 Wn. (2d) 340, 348, 128 P. (2d) 332, 141 A. L. R. 1257, wherein the view was expressed as follows:

"The question as to what constitutes a plain, speedy, and adequate remedy is not dependent upon any general rule, but upon the facts of each particular case, and its determination therefore rests in the sound discretion of the court in which the proceeding is instituted."

Considering the particular facts in the instant case and the likelihood that ·the matters therein may be of considerable public interest and importance, we are convinced no other speedy or adequate remedy at law is available to the subcommittee. The writ of prohibition will be made permanent.

MALLERY and GRADY, JJ., concur.

SCHWELLENBACH, C. J., and HILL, J. (concurring in the result)—We concur in the result for the reason that the judi-

ciary cannot interfere with or restrain the legislature in the exercise of its legislative powers.

DONWORTH, J. (dissenting)—I am of the opinion that the writ of prohibition should be denied because the superior court has jurisdiction of the parties and of the subject matter of the action. It is not threatening to act either without jurisdiction or in excess of its jurisdiction.

The question whether, under the showing made in the trial court, an injunction *pendente lite* should issue in the form contemplated involves the merits of the controversy and may be reviewed by us only upon appeal or application for a writ of certiorari.

Assuming, without deciding, that the superior court is threatening to commit error by entering the proposed injunction, this court has several times stated that it will not issue a writ of prohibition to prevent the commission of error. Our most recent discussion of this subject is found in *In re Jones*, 39 Wn. (2d) 956, 239 P. (2d) 856, in which we said:

"Rem. Rev. Stat., §§ 1027 and 1028, require the existence of two conditions to make a writ of prohibition available: (1) absence or excess of jurisdiction; (2) absence of a plain, speedy and adequate remedy in the ordinary course of legal procedure. *State ex rel. O'Brien v. Police Court*, 14 Wn. (2d) 340, 128 P. (2d) 332; *State ex rel. New York Cas. Co. v. Superior Court*, 31 Wn. (2d) 834, 199 P. (2d) 581; *State ex rel. Troy v. Superior Court*, 38 Wn. (2d) 352, 229 P. (2d) 518. As we said in *State ex rel. Prentice v. Superior Court*, 86 Wash. 90, 149 Pac. 321, and repeated in *State ex rel. Cheson v. Superior Court*, 22 Wn. (2d) 947, 157 P. (2d) 991, and *State ex rel. Case v. Superior Court*, 23 Wn. (2d) 250, 160 P. (2d) 606:

" 'Where the superior court has jurisdiction of the subject-matter in controversy, prohibition will not lie to prevent an erroneous exercise of such jurisdiction, where there is an adequate remedy by appeal or writ of review. The writ is not issued to prevent the commission of mere error, nor to take the place of an appeal, or perform the office of a writ of review for the correction of error. The writ will only issue to inferior courts where they are proceeding, or

threatening to proceed, without, or in excess of, their jurisdiction.' "

I do not see in the instant case any threatened action by the trial court without, or in excess of, its jurisdiction and, therefore, dissent from the action of this court in ordering the writ of prohibition made permanent.

HAMLEY, WEAVER, and OLSON, JJ., concur with DONWORTH, J.