Honorable Brian Hatfield State Representative, 19th District P. O. Box 40600 Olympia, WA 98504-0600
Honorable Erik Poulsen State Representative, 34th District P. O. Box 40600 Olympia, WA 98504-0600
Honorable Mark Doumit State Representative, 19th District P. O. Box 40600 Olympia, WA 98504-0600
Honorable Helen Sommers State Representative, 36th District P. O. Box 40600 Olympia, WA 98504-0600
Honorable Aaron Reardon State Representative, 38th District P. O. Box 40600 Olympia, WA 98504-0600
Honorable Mary Lou Dickerson State Representative, 36th District P. O. Box 40600 Olympia, WA 98504-0600
Honorable Jeff Gombosky State Representative, 3rd District P. O. Box 40600 Olympia, WA 98504-0600
Honorable Laura Ruderman State Representative, 45th District P. O. Box 40600 Olympia, WA 98504-0600
Honorable Ruth Fisher State Representative, 25th District P. O. Box 40600 Olympia, WA 98504-0600
Dear Representative Hatfield and other members of the House:
By letter previously acknowledged, you have jointly requested our opinion on the constitutionality of House Resolution 2000-4600, adopting the Permanent Rules of the House of Representatives for the 57th Legislature. Paraphrased, you have asked us to address the following question:
Does House Rule A-3(A)-which provides that during a tie inHouse membership, the powers of the Speaker may be exercised onlyby affirmative agreement of the two co-speakers-violate the spiritof one-person, one-vote principles as articulated by Reynolds v.Sims, 377 U.S. 533 (1964) or article I, section 19 of theWashington State Constitution?
Your expressed concern is that this rule, read in conjunction with Rule 15(A), may vest an unconstitutional degree of power in the co-speakers of the House because both co-speakers must agree to entertain motions before the House. Thus, either co-speaker may act unilaterally to prevent bills and other motions from coming to the floor of the House.
 Brief Answer
The combined operation of these rules may serve to create added impediments to actions being taken by the House as a body. However, the state and federal constitutions leave the internal operation of the House to the discretion of that legislative body, absent a clear violation of a constitutional right. For reasons discussed in more detail below, we do not find that the combined operation of these rules violates one-person, one-vote principles or the guarantee of "free and equal elections" provided by article I, section 19 of the Washington Constitution. Courts have not extended these principles beyond the constitutional assurance that each voter's ballot be weighted equally. Federal courts have, however, looked to other constitutional provisions in evaluating various claims that the votes of individual members of Congress have been unconstitutionally diluted. While there are no cases on the application of "vote dilution" principles under our state constitution, our courts would likely apply similar reasoning under parallel provisions of the Washington Constitution. However, applying these principles to the rules in question, they would likely find no constitutional infirmity. In order to demonstrate a "vote dilution" claim, the claim must be accompanied by a showing that the rules are not subject to change by a majority of the body. Our understanding of the current rules is that a majority of the members of the House adopted the rules in question and retain the ability to suspend, amend, or repeal them.
 Analysis
House Rule 15(A) of the Permanent Rules of the House of Representatives grants to the Speaker of the House the authority to move bills to debate before the assembly:
No motion shall be entertained or debated until announced by the speaker and every motion shall be deemed to have been seconded. A motion shall be reduced to writing and read by the clerk, if desired by the speaker or any member, before it shall be debated and by the consent of the house may be withdrawn before amendment or action.
2001-2002 Legislative Manual, 57th Legislature, at 457. In recognition of the "extraordinary circumstance" that the 2000 election produced an evenly divided House with 49 Republicans and 49 Democrats elected, the House adopted Appendix Rules A-1 through A-7 to "ensure fairness and promote cooperation" between the parties during the 57th Legislature. Id. at 470.[1] The Appendix explicitly provided that the Rules would not be implemented if a constitutional majority of the House Members elect a single speaker. Id. The 2001 session of the House elected two co-speakers, rather than a single speaker; thus, Rules A-1 through A-7 apply to this term of the House of Representatives.
Rule A-3(A) outlines the duties of the co-speakers of the equally divided House. It requires that the co-speakers jointly perform the duties and responsibilities of the Speaker of the House:
(A) Co-Speakers — The co-speakers shall jointly perform the duties and responsibilities of the speaker of the House and may represent the entire house in that capacity. The powers of the speaker may not be exercised individually by a co-speaker without the prior agreement of both co-speakers.
The co-speakers shall agree upon a procedure for dividing the duties of the chair and may jointly designate a co-speaker pro tempore, co-chief clerk, or any member to perform the duties of the chair, but such substitution shall not extend beyond an adjournment. All acts, resolutions, and other documents requiring the signature of the speaker shall be signed by both co-speakers.
Decisions regarding administration and operation of the House of Representatives shall be made jointly by the co-speakers or their designees. These decisions shall include, but not be limited to: Referral of bills to committee; appointment of conference committees; approval of house expenditures; approval of travel; decisions on points of order; employment and removal of employees; and designation of persons who shall act as representatives for the public press.
Id. at 470-71. The significant portion of this rule is the requirement that "the powers of the speaker may not be exercised individually . . . without the prior agreement of both co-speakers." Id. This requirement, combined with Rule 15(A), appears to require the consent of both co-speakers for any motion to be brought for vote. Where one co-speaker objects, the motion is not brought to the floor.
Your question directly relates to the authority of the House to enact rules governing its own conduct. Article II, section 9 of the Washington Constitution provides this authority:
Each house may determine the rules of its own proceedings, punish for contempt and disorderly behavior, and, with the concurrence of two-thirds of all the members elected, expel a member, but no member shall be expelled a second time for the same offense.
While the Washington State appellate courts have not had occasion to interpret this section, our prior forays into interpreting the scope of this provision have led us to observe that "[t]he manner or method governing the introduction of bills, memorials or resolutions, and the procedure to be followed in the legislative halls prior to final passage or adoption thereof are for the most part not controlled by the Constitution but are left to the rule-making power of each house." AGO 65-66 No. 10, at 2. That opinion reviewed the question of whether the House could carry over bills and bill numbers to a special session of the Legislature. We concluded that, absent any explicit constitutional prohibition on the form in which motions are introduced, the House may exercise its discretion in adopting rules governing its own conduct. Id. at 4 (citing State ex rel. Dunbar v. State Bd.,140 Wn. 433, 445, 446, 249 P. 996 (1926)).
Your letter suggested that the combined effect of these rules is to subvert the representative capacity of the House, viz. the one-person, one-vote principles articulated in Reynolds v. Sims,377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and the right to "free and equal elections" guaranteed by article I, section 19 of the Washington Constitution. Our analysis first summarizes the standards by which courts address challenges to legislative rules, then addresses the question you have raised concerning the constitutionality of the House rules.
1. Standards For Reviewing Legislative Rules
An analysis of whether a legislative rule meets constitutional standards must begin with an understanding of the deference courts have shown legislatures in passing appropriate procedural rules. In United States v. Ballin, 144 U.S. 1, 12 S.Ct. 507,36 L.Ed.2d 321 (1892), the Supreme Court articulated the rule that is the touchstone for reviewing legislative rules. The House "may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained." Ballin, 144 U.S. at 5. The factual context of Ballin was a challenge to a House rule on determining if a quorum is present. The Court held that it would not second-guess the House of Representatives in how to do its business.
With the courts the question is only one of power. The constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate, or even more just. It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time. The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house, and, within the limitations suggested, absolute and beyond the challenge of any other body or tribunal.
Id. Following the holding in Ballin, courts have shown marked reluctance to intercede in the legislative rulemaking absent a clear violation of the constitution. Until the latter half of the twentieth century, few cases were successful in overcoming this standard.[2] Even today, where the issue is the method by which the House conducts its affairs, courts will rarely intercede.[3]
 2. Application Of One-Person, One-Vote Principles To The Legislative Process
We turn now to the question of whether the legislative rules that are the subject of your question violate the state and federal constitutional provisions that contain one-person, one-vote principles. The United States Supreme Court extended the protections of the Equal Protection Clause to ensure proportional voter-representation in the Legislature in a line of cases beginning with Baker v. Carr, 369 U.S. 186, 207, 82 S.Ct. 691,7 L.Ed.2d 663 (1962). The principles articulated in those cases were later refined in Reynolds v. Sims, and companion cases on redistricting.[4] Boiled down to its simplest form, the Reynolds
court held that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." Id. at 568.
Thus, one-person, one-vote principles address circumstances in which voter ballots are not given equal weight. The United States Supreme Court explained this distinction in Gordon v. Lance,403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971). Gordon reviewed a West Virginia Supreme Court holding that a constitutional requirement that a supermajority of the state's voters (60 percent) approve any political subdivision's proposal to take on bond indebtedness violated the Equal Protection Clause "because the votes of these who favored the issuance of the bonds had a proportionately smaller impact on the outcome of the election than the votes of those who opposed issuance of the bonds." Id. at 4. The Supreme Court reversed, noting that the supermajority requirement applied to all bond referenda and did not single out a discrete and insular minority for unfavorable treatment. Consequently, the Court said, no "sector of the population may be said to be `fenced out' from the franchise".
Although West Virginia has not denied any group access to the ballot, it has indeed made it more difficult for some kinds of governmental actions to be taken. Certainly any departure from strict majority rule gives disproportionate power to the minority. But there is nothing in the language of the Constitution, our history, or our cases that requires that a majority always prevail on every issue. On the contrary, while we have recognized that state officials are normally chosen by a vote of the majority of the electorate, we have found no constitutional barrier to the selection of a Governor by a state legislature, after no candidate received a majority of the popular vote. Fortson v. Morris,385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966).
Gordon, 403 U.S. at 5-6. Accordingly, the Court upheld the authority of West Virginia to require a supermajority where the state chose to do so.
We applied a similar analysis to Washington's constitutional requirements in AGO 65-66 No. 83. Our office was asked whether Amendment 17 to article VII, section 2 of the Washington Constitution, which limits tax levy increases, conflicts with the "one-man, one-vote" principle enunciated in Reynolds. Amendment 17 required any tax levy in excess of forty mills must be approved by at least three-fifths (60%) of the electors voting on the proposition at an election where the total number of persons voting on the proposition constitutes not less than forty percent (40%) of the total number of votes cast in the particular taxing district at the last preceding general election. The opinion evaluated the question of whether the 60% or the 40% requirement operates to make it more difficult for proponents of a levy proposition to obtain passage than it is for the opponents to defeat it by merely withholding their vote. Id. at 2-3. The concern was that this anomaly violated the one-person, one-vote standard by giving different weight to votes not cast. The opinion found no violation of the one-person, one-vote principle:
"One man one vote" simply means that no qualified elector of a state or any political subdivision thereof shall, at any election held by his state or political subdivision, have his vote "weighted" in relation to the vote of any other elector by reason of such irrelevant factors as race, sex, economic or occupational status, or where within the electoral unit he happens to reside.
AGO 65-66 No. 83, at 13 (footnote omitted). As this quote makes clear, the essential feature of this doctrine is the concern that no vote be "weighted" in relation to another. Thus, where each vote for or against "weighs" the same, even where the measure is defeated for lack of voter turnout, there is no violation of equal protection.[5]
These authorities are illustrative of the application of the one-person, one-vote principle with respect to elections. Your question asks us to analyze whether and how one-person, one-vote principles apply to the manner in which legislators represent voters in their law-making functions. First, we note that no cases have successfully applied the principles of Reynolds to the legislative process itself.[6]
Extension of the doctrine to the manner and method by which legislation is introduced and considered is unlikely.[7] For example, members of the Arizona House of Representatives alleged a violation of equal protection when the majority party did not appoint minority members to standing committees in proportion to their membership in the House. The Ninth Circuit rejected this challenge, stating:
Plaintiffs argue that to deny to Democratic members of the House proportional membership on standing committees is to deny them the equal protection of the laws, and is also indirectly to deny to those who voted for them the equal protection of the laws. We think that these propositions are non sequiturs.
So far as appears, every member of the House was chosen in an election in which the one man one vote, equal protection, rule ofReynolds v. Sims . . . was fully complied with. In other words, so far as their rights to vote are concerned, the voter plaintiffs and all other voters similarly situated have had the full benefit of the protection of the Fourteenth Amendment.
Davids v. Akers, 549 F.2d 120, 124 (9th Cir. 1977). This decision was followed by another court asked to review similar claims of disproportionate representation. In Vander Jagt v. O'Neill,699 F.2d 1166 (D.C. Cir. 1982), fourteen Republican Members alleged a violation of the Equal Protection Clause when the Members were not given proportionate representation on House committees. They argued this disproportionate representation diluted their political power and the voters who elected them. The Court refused to intercede, finding unattractive the idea of fashioning a remedy that would "tell the Speaker of the House of Representatives how many Democrats, and perhaps even which Democrats, he is to appoint to the standing committees, and perhaps to each such committee."Id. at 1176 (quoting Davids, ellipsis in original omitted).[8]
While closely divided legislative bodies provide opportunities for manipulation of the legislative process, such maneuvers do not generally violate the one-person, one-vote doctrine. For example,Jubelirer v. Singel, 162 Pa. Commw. 55, 638 A.2d 352 (1994), arose out of the equally divided Pennsylvania Senate in 1993. Special elections were held for two vacancies in the Senate. One vacancy was filled by a Republican, the other by a Democrat. The President of the Senate administered the oath of office to the Democrat first. Id. at 60. Plaintiff contended this procedure resulted in the seating of the Democratic Senator-elect who might not have been seated had the Republican Senator-elect been seated first.[9] Plaintiff raised numerous constitutional challenges, including equal protection. Id. at 62, 72. The court rejected this challenge, stating, "[t]he right to vote guaranteed by the Pennsylvania Constitution is the right of suffrage to elect one's representatives. It is not the right of [the then unseated Republican member] to vote on a constitutional point of order before receipt of his election returns by the Senate." Id. at 72.
The upshot of this analysis is that it does not appear Rule A-3 would be found violative of one-person, one-vote principles founded in the Equal Protection Clause of the United States Constitution. Courts have not extended one-person, one-vote principles to the legislative processes. Because the rule does not directly affect the weight one voter's ballot is given over another, the rule is not a source of constitutional infirmity under the principles of Reynolds v. Sims.
3. `Free And Equal Elections' Under The Washington Constitution
You have also asked whether Rule A-3 violates article I, section19 of the Washington Constitution. That section provides that "[a]ll elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." As your letter points out, our courts have interpreted this provision to provide greater protection to the right to vote than does the federal constitution's one-person, one-vote equal protection right. Brower v. State, 137 Wn.2d 44,68, 969 P.2d 42, 56 (1998), cert. denied, Brower v. Wash.,526 U.S. 1088, 119 S.Ct. 1498, 143 L.Ed.2d 652 (1998); Foster v.Sunnyside Valley Irrig. Dist., 102 Wn.2d 395, 404, 687 P.2d 841,846 (1984).[10]
Although more protective of the franchise than the federal constitution, cases interpreting this provision have not extended the protections afforded by this section beyond the protection of the right of suffrage itself. See cases discussed in Foster,102 Wn.2d at 405-08. More recently, our Supreme Court declined to extend these protections to the manner in which a referendum is put to the voters. The Plaintiff in Brower challenged a referendum on construction and financing of a new stadium and exhibition center arguing, among other theories,[11] the referendum violated article I, section 19 of the state constitution. Brower,137 Wn.2d at 67-68. The court concluded there was no violation of this section of the constitution, as the right to vote on the referendum was not impeded by shortening the time in which the referendum was put to popular vote. Id. at 67-68.
In fact, our research has found no cases which extend the rights afforded by article I, section 19 to situations other than where the right of a voter is somehow directly impinged. See City ofSeattle v. State, 103 Wn.2d 663, 673, 694 P.2d 641 (1985) (article I, section 19 requires "that otherwise qualified voters who are significantly affected by the results of an election be given an opportunity to vote in that election."); Matthews v. WenatcheeHeights Water Co., 92 Wn. App. 541, 550, 963 P.2d 958 (1998) (discussing post-Foster decisions as applied to irrigation districts), review denied 137 Wn.2d 1029 (1999). See generally West's Revised Code of Washington Annotated, Const. art. I, § 19 (2001).
In a vein similar to our conclusion with respect to the federal Equal Protection Clause, we find no direct support for finding the combined effect of Rule A-3 with Rule 15 violates the Washington Constitution, article I, section 19. This does not end our analysis, however.
4. Representative Vote Dilution
Although your letter cites the principle holdings of Reynolds andFoster, a fair reading of your letter asks us to broaden the analysis to evaluate "legislative rules which prevent duly elected members of the House of Representatives from voting on issues on the floor of the House, even when a majority of those elected wish to take such a vote on behalf of our constituents." Courts have addressed claims that various procedural rules of a legislative body have diluted the vote of representatives under other constitutional theories. These "vote dilution" cases have alleged violations of the Presentment Clause of Article I, Section 7 of the United States Constitution.[12] These courts found that allegations that a representative's vote had been "diluted" stated a cognizable claim, but the allegation must be accompanied by a showing that the procedures were not subject to change by a majority of the body. The fact that the changes might be difficult, and a majority would need to first vote on procedural and then substantive issues, did not change the analysis.
A recent and helpful "vote dilution" case is Skaggs v. Carle,110 F.3d 831 (D.C. Cir. 1997). In that case, members of the United States House of Representatives challenged the constitutionality of two House rules. The first required a three-fifths majority to pass certain types of federal income tax legislation, and the second rule provided: "It shall not be in order to consider any bill, joint resolution, amendment, or conference report carrying a retroactive Federal income tax rate increase." Id. at 833, quoting House Rule XXI(5)(d). With regard to the latter rule, the parties challenging the rule "argued both that it unconstitutionally precludes the House from considering legislation upon which it is empowered by Article I, § 8 to act, and that it abridges thefirst amendment rights of the individual Members to speak and, on behalf of their constituents, to petition on the floor of the House." Id. The court dismissed these claims, as the effect of this rule on Members' ability to consider retroactive tax bills was not sufficiently concrete. Id. at 836. Similarly, the court dismissed the allegations of abridgement of Members' First Amendment right, as there was no clear penalty for the exercise of this right other than to be found "out of order".
The court focused most of the opinion on the rule requiring a three-fifths supermajority and found that the rule did not violate the Presentment Clause by preventing a majority of members intent on passing the legislation from exercising their legislative will. The Court first outlined the procedures available to a majority of the members:
Both the House Rules and their role in the 104th Congress strongly suggest that Rule XXI(5)(c) does not prevent 218 Members set upon passing an income tax increase from working their legislative will. First, the House Rules allow any Member to introduce a resolution to amend or to repeal Rule XXI(5)(c), and any such resolution could be adopted by the vote of a simple majority. See House Rule X(1)(m) and XI(4)(d); see also, forexample, H. Res. 168, 104th Cong., 1st Sess., 141 Cong. Rec. 6104, 6116 (1995) (amending Rule XIII(4)). Although the Rules Committee would have jurisdiction over such a resolution and might slow or block its consideration, 218 Members of the House could by petition cause a resolution to be discharged from that Committee and put to a vote on the floor of the House. See generallyDeschler's Precedents of the United States House ofRepresentatives, vol. V, at 3 (motion to discharge); id., vol. I, at 318-319 (procedure for discharging from Rules Committee resolution to amend the rules). Similarly, if the Rules Committee determines that the vote on a bill should be governed by a special rule, a simple majority may amend that rule. See id., vol. VI, at 328-329. For that matter, a simple majority may suspend Rule XXI(c)(5) in order to allow a bill carrying a tax increase to pass by a simple majority vote; although suspending a rule ordinarily requires the support of two-thirds of those voting, see House Rule XXVII, a simple majority has in the past resolved to suspend this two-thirds requirement. VIII Cannon's Precedents of the House ofRepresentatives at 841.
Skaggs, 110 F.3d at 835. These procedures allowed a simple majority to move legislation forward, which meant there was no basis for a vote dilution claim. The Court went on to state:
[C]ontrary to the dissent, these procedures for amending, suspending, and repealing the House Rules are not "alternative remedies" for the vote dilution allegedly worked by Rule XXI(5)(c). Rather, if a simple majority can prevail in the House by voting first on a procedural and then on the substantive issue, then there has been no vote dilution even arguably offensive to the presentment clause.
Id. at 835. The court noted that while these procedures were complicated, they had been used in the past and did not prevent a simple majority from enacting an income tax increase. Even the dissent recognized that procedural rules which may require a supermajority to move legislation forward do not conflict with the Presentment Clause requirement that a bill which has passed both houses of Congress be presented to the President. Id. at 846 (Edwards, C.J., dissenting).
Similarly, Michel v. Anderson, 817 F. Supp. 126 (D.D.C. 1993),aff'd 14 F.3d 623, (D.C. Cir. 1994), addressed a challenge to a House of Representatives' rule which allowed delegates from United States territories and the District of Columbia to vote on matters before the House Committee of the Whole. A second rule provided that, where the delegates cast a deciding vote, the issue would be automatically referred out of the Committee so that only Members of the House would vote on the matter. Plaintiffs claimed the rule diluted the legislative power of Members of the House by giving votes to delegates who do not constitutionally qualify as voting members in violation of Article I, Section 2 of the United States Constitution.[13] Id. at 140. The court agreed that, given the power of the Committee of the Whole to affect legislation eventually voted on by the Members, that rule in isolation was unconstitutional; it essentially vested non-Members with the right to vote on legislation. Id. at 141.[14] However, the two rules taken together reveal that the vote before the Committee of the Whole was largely symbolic since, if the delegates' votes determined the legislation's passage, a new vote just by bonafide Members was required. The two rules taken in tandem were thus not unconstitutional. Id. at 145.[15]
Although these cases turn on federal constitutional requirements, it is conceivable that similar challenges could be brought under our state constitution. For example, article II, section 22 requires: "No bill shall become a law unless . . . a majority of the members elected to each house be recorded thereon as voting in its favor." The language contained in the federal constitution's Presentment Clause is closely paralleled in the provision of our state constitution providing for the Governor's veto authority.Compare U.S. Const. art. I, § 7, with Const. art III, § 12. While our courts have not had occasion to address this issue, there is no reason to believe that a different analysis is required from that previously discussed. Given closely related constitutional provisions, our courts may reasonably find an established body of federal case law persuasive in construing similar provisions of the Washington Constitution. See, e.g., Gerberding v. Munro,134 Wn.2d 188, 198-200, 949 P.2d 1366 (1998) (interpreting provisions of the state constitution governing qualifications for elected office similarly to the manner in which federal courts construed similar federal provisions).[16]
If these principles were applied under our state constitution, the issue would be the same as that presented in the Skaggs case: whether the rules as a whole prevent a majority of members intent on passing legislation from exercising their legislative will. Before a cognizable claim of vote dilution could be brought, it would need to be shown that every avenue was pursued under the rules, and the majority was still prevented from exercising their legislative will. As in Skaggs, "if a simple majority can prevail in the House by voting first on a procedural and then on the substantive issue, then there has been no vote dilution even arguably offensive to the presentment clause." Skaggs,110 F.3d at 835.
Whether a majority could use the House rule in this manner depends on how the rules operate in the internal workings of the House. We are not experts on these procedures, but note that there are mechanisms that appear to allow the majority to exercise their will. First, on one day's prior notice, any Member may introduce a resolution to amend or to repeal Rule A-3(A), and any such resolution could be adopted by the vote of a simple majority.2001-2002 Legislative Manual at 468 (Rule 30). A majority of representatives may therefore change a rule that is perceived to impede the ability of the House to accomplish its constitutional mandate. One could posit a situation where the speaker or co-speakers could block consideration of the resolution under Rule 15, which provides "[n]o motion shall be entertained or debated until announced by the speaker".[17] Id. at 457. However, a court would likely require a showing that such resolution had been proposed and effectively blocked from consideration before finding a cognizable vote dilution claim.
Even then, a court could determine there is no cognizable vote dilution claim because the majority of the House controls who holds the offices that implement the procedures. The authority of a presiding officer is derived wholly from the body by which the officer is elected and over which the officer presides. See Thomas B. Reed, Reed's Parliamentary Rules ¶ 36, found at http://www.leg.wa.gov/legis/reedsrules/reeds.htm (visited Nov. 13, 2001).[18] The rules passed by the House specifically delineate the powers and duties of the Speakers. 2001-2002 LegislativeManual, at 449 (Rule 4). House Rule 3 provides for election of a speaker of the House at the commencement of each term, but it also provides that the office may be declared vacant by the vote of a constitutional majority of the House. We presume the majority could act under this rule and that this would be true even after House Rule A-3 came into effect.
Further, the fact that there are co-speakers, neither of whom received a majority vote, does not change this analysis. The majority from whom the co-speakers derived their authority adopted the rules which created this convention for dealing with a tie in party affiliation. As noted in Reed's Parliamentary Rules,
paragraph 25:
 Officers are sometimes, under a Special resolution, elected by a plurality of votes, as in the case of the election of N.P. Banks as Speaker of the Thirty-fourth Congress. But in this case the action of the minority had the antecedent sanction of the majority; that is, the majority had voted that whenever any member had a plurality of votes he should be Speaker, whoever he might be.
 In a similar fashion, Rule A-2 provides that each member of the House is allowed one vote, and the two candidates receiving the highest number of votes are elected. 2001-2002 Legislative Manual,
at 470. While a minority may have elected either of the co-speakers, a majority approved of the process.
 CONCLUSION
All procedural rules limit or "channel" the legislative process to some extent. The necessity for doing so flows from the nature of a legislative assembly as a multi-member body. As long as they are procedural in nature and serve to provide a legislative body with an orderly process for doing its business, we doubt that they would be subject to constitutional question. Courts have not applied the one-person, one-vote principles of Reynolds and Foster
to the legislative process. Federal courts have addressed claims of "vote dilution" brought under other provisions of the constitution challenging various legislative rules. However, to the extent a majority of the legislative body can change the procedural rules in such a way that would allow a vote on a substantive issue even if such changes are complex and difficult, we do not believe a court would conclude that the votes of individual legislators have been diluted in violation of the constitution.
Having addressed the question posed in your letter, we add one additional point. Our opinion should be taken neither as an endorsement of Rule A-3 nor as a criticism of the House for adopting it. We recognize that each House elected (and especially one with a tie in partisan composition) has to make difficult policy choices in determining its rules of procedure.
We trust this opinion is of assistance to you.
Sincerely,
JONATHON GURISH Assistant Attorney General (360) 586-2697
[1] The 1979-1981 and 1999-2001 Sessions of the Legislature also involved 49-49 ties in the House and, in each of those sessions, rules identical to Rules A-1 through A-7 were also adopted.
[2] Compare Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, L.Ed. 1385 (1939) (dismissing action to compel Secretary of Senate to erase an endorsement that a resolution had been adopted by the state senate); Fairchild v. Hughes, 258 U.S. 126, 129,42 S.Ct. 274, 66 L.Ed. 499 (1922); State ex rel. Hodde v. Sup. Ct. ofThurston Cy, 40 Wn.2d 502, 244 P.2d 668, 676, 244 P.2d 668 (1952) (writ of prohibition issued to prevent judicial interference with legislative investigation) with Powell v. McCormack, 395 U.S. 486,89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (House was without authority to deny seat to duly elected representative); Bond v.Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) (refusal to seat representative for expression of opposition to war violated First Amendment rights); Parker v. Merlino,493 F. Supp. 381, 386-87 (D.N.J. 1980) (challenge to senate rule to cut off debate on bill was justiciable).A notable exception to this observation is perhaps United States v. Smith, 286 U.S. 6,52 S.Ct. 475, 76 L.Ed.2d 954 (1932), invalidating Senate Rule XXXVIII. However, as if to underscore the exceptional circumstances under which the Court will intercede, the Court noted, when "the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one". Id. at 33.
[3] In at least one respect, our task in responding to your question may differ from the approach taken by a court. Courts presented with disputes regarding a legislative body's internal procedural rules often express significant concern as to whether a court is the right forum in which to resolve them. The United States Supreme Court has emphasized the importance of prudential concerns in determining whether it is appropriate to resolve a dispute, particularly where it "would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Raines v. Byrd,521 U.S. 811, 819-20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). "In the light of this overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of this important dispute and to `settle' it for the sake of convenience and efficiency." Id. at 820 (footnote omitted). In cases involving challenges to legislative procedural rules, no less than in other types of lawsuits, the plaintiff must establish the requisite standing to pursue the claim. Skaggs v. Carle,110 F.3d 831, 834 (D.C. Cir. 1997). In that case, discussed at length below, the court concluded that individual Members of Congress lacked standing to challenge two rules of the House of Representatives because they could not show that they had been harmed by those rules. Id. at 836; see also Page v. Shelby,995 F. Supp. 23, 26-27 (D.D.C. 1998), aff'd, 172 F.3d 920 (D.C. Cir. 1998) (concluding that an individual voter lacked standing to challenge an internal rule of the United States Senate). We view our task in this opinion, however, as one of providing you with our best analysis of the merits of the underlying principles; we offer no opinion as to whether a court would reach the merits in any particular case, given the prudential concerns that may arise in a specific lawsuit.
[4] WMCA, Inc. v. Lomenzo, 377 U.S. 633, 845 S.Ct. 1418,12 L.Ed.2d 568 (1964); Lucas v. Forty-Fourth Gen. Assembly,377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Maryland Comm. forFair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429,12 L.Ed.2d 595 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441,12 L.Ed.2d 609 (1964); Roman v. Sincock, 377 U.S. 695,84 S.Ct. 1449, 12 L.Ed.2d 620 (1964).
[5] For a thorough discussion of Reynolds and subsequent cases, see AGO 1970 No. 28.
[6] A letter opinion, written several years after Reynolds was decided, postulated that the constitutional requirement of one-person, one-vote principles might be extended to subsequent aspects of the legislative process. AGLO 1971 No. 126. However, thus far, the case law has not followed in the paths suggested by that opinion.
[7] Of course, rules that limit an individual legislator from performing functions could perhaps be challenged under other constitutional provisions. For example Powell v. McCormack,395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), held that the United States House of Representatives was without authority to deny membership to a duly elected representative who met the qualifications of Article I, Section 2 of the Constitution, andBond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235
(1966), found that a refusal to seat a representative for expression of opposition to war violated the representative'sFirst Amendment right to freedom of speech.
[8] See also Brown v. Hansen, 1992 WL 73119 (D. Virgin Islands Mar. 19, 1992), in which six senators challenged the passage of rule amendments which, by function of the standing rules, lacked the required two-thirds majority vote. The court refused to find the rule unconstitutional as it did not directly diminish the representative strength of any voter. Id. at *9.
[9] The basis for this claim was that the election for the position claimed by the Democratic Senator-elect was subject to a contest challenging the validity of that candidate's election.Jubelirer, 162 Pa. Commw. at 61, n. 1. See Marks v. Stinson,19 F.3d 873 (3rd Cir. 1994) (resolving federal challenge to the contested election).
[10] The Foster court summarized the intent of the Constitutional Convention to ensure that "no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." The court went on to characterize the right protected:The language of Const. art. 1, § 19 is not to be interpreted literally: "elections and voters may . . . be regulated and property controlled"; in certain limited situations, the right to vote on an issue or for a representative may be confined to those persons directly affected by the issue or representative body.Foster, 102 Wn.2d 395, 408, 687 P.2d 841
(1984) (quoting State v. Wilson, 137 Wn. 125, 132-33, 241 P. 970, (1925)).
[11] Plaintiff also alleged that the legislation gave the right of veto to a private party because it would not go into effect unless the private party agreed to reimburse the costs of the special election. The Court rejected this claim, stating "the Legislature itself made the determination that the Act would be null and void unless a reimbursement agreement was entered". Brower v. State,137 Wn.2d 44, 59, 969 P.2d 42 (1998). In a similar vein, a claim that Rule A-3 gave authority to one of the co-speakers to veto a bill fails to recognize that the rule represents a decision by the legislative body itself, acting through a majority, as to how the body should conduct its business.
[12] Clause 2 of Article I, Section 7 provides, in relevant part: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States[.]" (Emphasis added). The issue becomes whether any rule that requires more than a simple majority redefines the term "passed" in this clause to require a supermajority.
[13] This section provides in relevant part: "Representatives . . . shall be apportioned among the several States which may be included within this Union, according to their respective Numbers". U.S. Const. art. I, § 2, cl. 3. Plaintiffs also alleged the rules violated the principles of bicameralism and presentment.Michel, 817 F. Supp. at 140.
[14] Specifically, the Court found it a violation of Article I, Section 2, Clause 1 of the United States Constitution which requires the "House of Representatives shall be composed of Members chosen . . . by the People of the several States".
[15] The federal cases in this area are often decided based on standing or questions about the exercise of court jurisdiction in cases concerning the internal affairs of the legislative branch. It is likely that state courts would be similarly reluctant to take up challenges to legislative rules. Some of that reluctance may involve the question of whether a court should construe a legislative rule, or leave the interpretation of procedural rules to the body itself. See, e.g., Skaggs v. Carle, 110 F.3d at 836
(citing United States v. Rostenkowski, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)), for the proposition that "[w]here . . . a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules — a power that the Rulemaking Clause reserves to each House alone." We also hesitate to comment on the internal workings of the House, but one of our statutory functions is to advise legislators on questions relating to their duties. RCW 43.10.030(5).
[16] In addition to looking at our constitutional history and prior case law, the court looked at cases across the country interpreting similar constitutional provisions. Gerberding,134 Wn.2d at 206-09.
[17] There may be other procedural avenues available to the majority. See 2001-2002 Legislative Manual at 464 (Rule 22) (appeal from the decision of the chair); Id. at 460 (Rule 17(J)) (appeal to House for transgression of the rules of debate). We are not in a position, a priori, to determine the effect of these rules, since that is a matter of interpretation left to the House under article II, section 9, infra p. 4.
[18] House Rule 29 provides: "The rules of parliamentary practice comprised in Reed's Parliamentary Rules shall govern all cases in which they are not inconsistent with the standing rules and orders of the house." 2001-2002 Legislative Manual at 468. See also Rule A-1 (adopting Reed's). Paragraph 36 of Reed's Parliamentary Rules
provides: "A presiding officer elected by an assembly may be removed by the assembly whenever such a course seems suitable to the body."